13178

STATE v. JENNINGS

(159 S. E., 627)

Mr. *Frank A. McLeod, Solicitor,* for the State.

Messrs. *D. W. Robinson, D. Gordon Baker* and *A. S. Merrimon,* for respondent.

June 13, 1931.

*Per curiam.*

This is a proceeding for the disbarment of respondent, a member of the Sumter County Bar.

At the October, 1930, term of this Court, upon recommendation of the Committee on Grievances of the South

Carolina Bar Association, pursuant to the statutes governing a case of this kind, we issued a rule against the above-named respondent to show cause at the November, 1930, term why his name should not be stricken from the list of attorneys of this State and his license to practice law surrendered and canceled. The charges and specifications on which the rule was based were made a part of it.

The cause was not taken up for hearing until the December term. At that time the State moved to amend the rule by the insertion of an additional specification of unprofessional conduct on the part of respondent, which motion was granted.

The testimony in the case was taken in open Court and consumed a number of days of both the December, 1930, and January, 1931, terms. The record is huge and the exhibits manifold. The Court has given careful consideration to all the evidence produced by both sides.

Respondent, now of the age of fifty-nine years, was born in Sumter County. He was admitted to the practice of law in January, 1897, and, in addition to many other activities to be noted hereafter, has practiced continuously since that date.

He now stands before this Court charged with unprofessional conduct of a character which the State claims should merit his disbarment.

Under one Statute of South Carolina (Section 279, Code of Civil Procedure, 1922), an attorney "may be removed or suspended who shall be guilty of any deceit, malpractice, or misbehavior." By a later Act (Section 284, Code of Civil Procedure, 1922), any member of the South Carolina Bar may be cited by the Grievance Committee of the South Carolina Bar Association "for misconduct as an attorney at law," and presented to this Court for trial and judgment. Neither of these Statutes, however, take away or limit the inherent common-law power of the Courts to suspend or disbar any attorney for gross misconduct not falling within

their terms. In fact, by Section 275 of the same volume it is expressly provided that "nothing herein contained shall be construed to deprive Courts of this State of the power, as at present existing, of disbarring or otherwise punishing members of the bar."

The terms "misconduct" or "gross misconduct," with reference to a member of the bar, have gained by judicial interpretation a well-defined meaning. It is to the credit of the bar of South Carolina that its books record but a few of these unfortunate cases. In those that have been passed on by this Court, it has been held that the acts charged against an attorney to warrant his disbarment or suspension must be of such a character as to show that their commission was with a bad or fraudulent motive, and they must be supported by a clear preponderance of the evidence. The conduct must be so gross as to show a want of integrity, moral turpitude, depravity of character, or dishonesty. There should be "a· clear conviction of moral fraud."

Generally stated, the purpose of suspension or disbarment is the removal of unfit persons from the profession. The primary purpose is not punishment, but protection of the Courts and the public from contamination with one who has proved himself unworthy.

In the light of these fundamental principles, we approach a consideration of the specific charges against respondent.

The original rule contains five specific instances of alleged unprofessional conduct and a sixth or general charge of misconduct in the particulars assigned. In substance, these specifications charge the use and investment of clients' funds without the clients' consent, and/or without disclosing to the client the nature of the security and its value; failure to satisfy mortgages with funds entrusted for that purpose; assignments, releases, and satisfactions of mortgages of clients without their knowledge or consent; and, in general,

the alleged commingling of trust funds with personal funds, upon which he is alleged to have paid interest to clients on such funds entrusted to him for investment, whether or not such funds had been invested.

The particular transactions dealt with in the testimony occurred in the period prior to 1924. But one former client, in support of these charges and claiming to have been affected by respondent's conduct, has appeared before us.

These identical charges, it seems, were preferred against respondent before the Sumter County Bar Association in 1924. An investigation of them at that time was made by that association, respondent appearing before that tribunal in person, and also filing an answer in writing to the particular charges presented. That association apparently took no action in the premises. Thereafter, in 1926, at the request of the then chairman of the Committee on Grievances of the South Carolina Bar Association, the matter was reopened. No action, however, it would appear, was taken by that committee until some time in the latter part of 1930. Meanwhile, throughout that period, respondent has continued his practice without further suggestion of improper conduct. Why these charges were not presented and pressed when the facts were fresh and the original papers and documents available has not been explained. Courts generally regard with disfavor proceedings of this kind after a great lapse of time, and properly so; though, of course, the statute of limitations has never been held to apply to a disbarment proceeding.

Admitted to the bar at a comparatively youthful age, with only the benefit of a high school education, respondent, endowed with an abundance of energy and optimism, made rapid strides in the profession. Having built up an extensive and successful law practice, he participated in public duties of many kinds, notably as mayor of Sumter, for about fourteen years, as chairman of the good roads commission of his county for a number of years, and many others. In business he found success, likewise, as president of one of the large

banks of Sumter County and in the operation and development of extensive farming interests. His manifold activities naturally brought him many clients further extending his law business. Accompanying these widespread interests, he found in his office a number of clients with money to invest who looked to his judgment as a business man rather than to his ability as a lawyer. He built up a tremendous business of loaning money and making investments for clients. According to the evidence, real estate mortgages in the aggregate sum of about one million and a quarter dollars appear on the records of Sumter and Lee Counties in his name as mortgagee. He frankly admits that he paid these clients interest on funds intrusted to him for investment, whether or not they were invested. He claims, and the record would appear to support the claim, that in this period, that is, prior to 1921, these clients looked to him personally and not to the security on which their loans were made. Investments were made in his own name; assignments, likewise, and even suits instituted or defended in his name, which involved such mortgage loans. He claims, and it is not disputed, that he handled their money as his own. They looked to him only for the interest. All went well so long as he was wealthy and prosperous. His guaranty was readily accepted by any one. Flushed with the ego of success and living in a dream world of an ability to assume and discharge any kind of liability, he hesitated not, but little reckoned the end. The depression of 1920 engulfed him and many of these clients with him.

While we find in these transactions a reprehensible laxity worthy of the severe condemnation of this Court, yet in the light of all the testimony, we cannot say that there has been proven by the clear preponderance of the evidence offered, that bad or fraudulent motive, depravity of character, or dishonesty or want of integrity, which would warrant his suspension or disbarment on these charges alone. His records presented to the Court are clear and satisfactory. His character has been attested by a large number of witnesses within

and without the profession. In respect to these transactions, he assumed too much, and when the financial debacle came he was destroyed like so many others in that distressing period of the last ten years in our State.

Were these the only charges preferred against him, we think that they might be dismissed with the severe censure and reprimand of this Court for his reprehensible laxity in these matters and in the general conduct of his profession. But, as noted above, the rule against him was amended by permission of the Court so as to insert an additional specification covering his conduct as guardian of one Alston J. Stubbs, a minor. This charge, to our mind, requires more definite action by this Court.

Briefly, the facts are these: On March 1, 1920, respondent was appointed guardian of the above-named minor by the Probate Court of Sumter County. He received as such guardian total assets of his ward's estate in a sum aggregating something over $30,000.00. Thirteen thousand dollars of this amount was in quick assets, cash and bank stock, and the remainder was represented by real estate in the City of Sumter. On the day of his appointment as guardian, he took a conveyance to himself from the mother of the minor, who was his trustee, of all the real estate owned by the minor for a stated consideration of $17,000.00.

On this same day also, after receipt of the entire assets of the minor's estate, as above set out, he executed and delivered to himself as guardian, a bond and mortgage dated March 1, 1920, in the sum of $30,600.00, with interest at 8 per cent. per annum. The mortgage securing this bond covered a tract of farm land in Sumter County. From the records produced before us this mortgage was a fifth mortgage in order of priority on the mortgaged premises, being subject to prior liens of $41,000.00 or more.

This mortgage, according to the records, was satisfied by respondent on January 3, 1921. Although satisfied of record in January, 1921, no new security apparently was taken by

respondent as guardian until September 23, 1921, when again he executed to himself, as guardian, a mortgage on another tract of farm land owned by him in Sumter County. This mortgage was also a fifth mortgage in order of priority, being subject to prior liens of approximately $44,000.00 or more. This mortgage was satisfied of record on September 22, 1923.

On this date respondent again executed to himself, as guardian, a mortgage on property in the City of Sumter known as the Masonic Temple lot. This mortgage was a fourth mortgage in order of priority, and was subject to prior liens of $36,000.00 or more. This mortgage was subsequently wiped out by foreclosure of the senior mortgages.

More than a month passed after the extinction of this security before respondent, according to the records, obtained other security for his bond. He then, on March 14, 1925, executed to himself, as guardian, a mortgage on another tract of farm land owned by him. This mortgage was fourth in order of priority, being subject to prior liens of $114,000.00 or more. This mortgage likewise was subsequently wiped out through foreclosure of the senior mortgages.

Following the extinction of the last referred to real estate mortgage through foreclosure, he then on July 18, 1925, executed to himself, as guardian, a chattel crop mortgage covering certain crops grown in the year 1925 on land owned by him. No explanation was given by respondent as to the disposition of this security. Presumably it, too, was wiped out.

And finally, on June 8, 1926, he again executed to himself, as guardian, a real estate mortgage on a lot of land in the City of Sumter known as the "Bland Motor Company." This mortgage was third in order of priority, being subject to prior liens of $39,000.00 or more. This mortgage also was wiped out through foreclosure of the senior liens.

The result is that the estate of the ward has been completely devastated. It is now represented by an open unsecured debt against respondent who is, admittedly, insolvent.

Unfortunately for the minor, who became of age in October, 1930, his mother was surety on the guardian's bond. She, too, has lost heavily and is not able to respond financially.

A plain recital of the foregoing facts is in itself an indictment of the severest character of respondent's conduct in this case. As a lawyer of experience and ability he knew, and he was charged with the knowledge, that in his keeping there had been placed a sacred trust. We have not seen in the books a grosser betrayal of a fiduciary relationship.

He closed his eyes to both the chart and compass which had been provided by this Court:

"This is a rule, founded on policy, and of general application, and not depending upon the fairness or fraud of particular transactions. A trustee to sell, is forbidden to purchase at his own sale, however full may be the price he offers, and however frank and honest may be his conduct; and so a trustee to lend, shall not make the loan to himself, nor in lending to another, substitute his own rights and credits for the trust money." *Mulligan v. Wallace,* 3 Rich. Eq., 111.

His attempted defense of his conduct as guardian of this minor may explain but cannot excuse his actions. His evidence, in brief, is that at his death the father of the minor was purchasing some real estate near the City of Sumter and subdividing it for sale to negroes. That the widow, mother of the minor, found it difficult to carry on this project, and came to him for assistance, urging him to take over the property so that it might be saved for the boy when he would become of age. He states that his agreement was to buy the property and give his own bond and mortgage for it, reserving the right to change the security as he desired. And further that he fully advised Mrs. Stubbs and the Probate Judge of Sumter County as to the security he would offer.

That the properties on which the several mortgages above referred to were given were very valuable according to values of the time so that the security of the mortgages thereon was good. That he paid interest regularly on the bond until 1928, total interest payments amounting to over $18,000.00. That returns were filed by him as guardian with the Probate Court up to 1924, and again in 1928. That Mrs. Stubbs, the mother of the minor, and surety on his guardianship bond, was familiar with the character of the security given by him to secure his bond, and readily surrendered the several mortgages to be satisfied when requested by him to do so. That he took over the Stubbs property with no idea of making any profit out of it, but merely to help the Stubbs family and assure them a fixed income for the support and education of the minor. That, in addition to the mortgage security for this debt, he carried life insurance as a further protection until he could no longer carry it. He further stated that he desires to see every cent of this indebtedness repaid, and that if allowed to continue his practice the prospects are bright for repayment.

Mrs. Stubbs and the Probate Judge, on the witness stand, controverted the above statements as to their knowledge of the character of the security taken for respondent's debt.

As an officer of the Court, an attorney is at all times subject to its control. His admission to practice carries with it the imprimatur of the Court and is *prima facie* a certificate of good moral character. In a proceeding for disbarment the Court undertakes to ascertain "whether the lawyer accused is no longer worthy to bear the Court's imprimatur." It is entirely within the discretion of the Court, as the result of such investigation, what punishment shall be imposed. Complete disbarment, suspension, or terms and conditions are matters solely for the judgment of the investigating tribunal.

"The Court may, instead of striking an attorney's name from the rolls, merely suspend him from practice for a speci-

fied length of time or until the performance of prescribed conditions." 6 C. J., 612.

Due regard for the serious nature of this charge against defendant and the present predicament of the innocent minor has caused the Court much concern in coming to its determination as to the disposition of this proceeding. The Court is faced with the performance of a painful duty. To censure and condemn, in the records of this tribunal, a member of the bar should often enough be punishment sufficient in itself for the offending lawyer. But when the rights of the innocent are interwoven in the cause the appeal of the injured should not go unheard. Respondent states that he is anxious to help this young man; that if permitted to continue to practice he will help him, and he assures the Court that his practice now, in spite of his misfortunes, is rapidly increasing in profitable earnings. It seems to the Court that the ends of justice will best be subserved in this cause by giving respondent the chance that he asks to make good before this Court and the eyes of his fellowmen, upon proper terms and conditions with respect to his obligation to this minor whose estate has been devastated by his conduct.

According to his testimony, he contemplates reasonably an annual income of ten to fifteen thousand dollars. Having in mind general conditions hereabout, we must make allowance therefor in calculating reasonable terms and conditions in the judgment to be entered herein.

It is the judgment of this Court that L. D. Jennings, respondent herein, be disbarred from the practice of law in this Court and in all other Courts of this State; provided, however, that the foregoing judgment be suspended upon the following terms and conditions:

(1) That the said L. D. Jennings shall on the first day of each and every month commencing with the 1st day of July, 1931, and until the further order of this Court, pay to the above-named Alston J. Stubbs the sum of $100.00.

(2) That the said L. D. Jennings shall forthwith procure and deliver to the said Alston J. Stubbs a policy of insurance on his life, in the sum of $15,000.00, payable to the said Alston J. Stubbs, as beneficiary named therein; and that he deliver to the said Alston J. Stubbs the premium receipts on said policy or policies as the premiums thereon are paid by him, as evidence of the payment thereof.

(3) That upon default by respondent, in compliance with any of the foregoing terms and conditions, the said Alston J. Stubbs, or his attorney, may forthwith apply to this Court for an order revoking the suspension of the judgment herein.

Eugene S. Blease, C. J.,

T. P. Cothran, J.,

John G. Stabler, J.,

Jesse F. Carter, J.,

John I. Cosgrove, A. A. J.

### Order on Petition for Correction of Errors

The respondent has filed herein two petitions, styled "Petition for Correction of Errors" and "Supplemental Petition."

Being undesirous, even through a technical inaccuracy of statement, of portraying respondent's conduct in a darker hue than is fully justified by the evidence, the Court willingly has taken cognizance of and has carefully considered the specifications of alleged errors in its opinion as suggested by these petitions.

They will be considered and disposed of in the order presented.

Specification I. We are satisfied upon the whole testimony that the opinion correctly states the nature of the assets received by respondent, as guardian, for the preservation and safe-keeping of which he gave his bond in the sum of $30,600.00.

Specification II. The opinion states, at page 269 (page 630 of 159 S. E.), that the first mortgage given by respondent as security for his bond of $30,600.00 "was a fifth mort-

gage in order of priority on the mortgaged premises, being subject to prior liens of $41,000.00 or more."

This mortgage was a blanket mortgage on a tract of land containing about 774 acres. It seems, on closer analysis, that this tract was made up of two smaller tracts, each of which was incumbered by two mortgages, making four in all, which were senior in priority to the guardianship mortgage. Technically, of course, the guardianship mortgage was a third mortgage as to each separate tract, but as to the whole tract on which the guardianship mortgage was placed, there were four mortgages prior thereto. For all practical purposes, had the ward attempted to obtain the security pledged by respondent, he would have had to get rid of four mortgages before realizing a first lien on the whole premises conveyed as security for the guardianship bond.

Counsel for respondent at page 75 of his written argument specifically refers to the four mortgages as "mortgages prior to that on the whole or on different parts."

Counsel for the State, likewise, at page 26 of his written argument, speaks of this mortgage as the fifth in order of priority.

However technically accurate respondent may now seem to be as to the exact priority of this mortgage, the force and effect of his conduct at the time the mortgage was given was the execution and delivery of a mortgage which was fifth in order of priority upon the whole tract upon which the mortgage was given.

Specification III. The same objection is voiced to the language of the Court concerning the mortgage executed by respondent on September 23, 1921. With respect to this mortgage a similar situation appears to have existed. The whole tract which was mortgaged by respondent was composed of several smaller tracts having mortgages thereon. What we have said above as to specification II is also applicable here.

Counsel for respondent in his argument, at page 76, lists four mortgages which he said "were mortgages on this land or parts of it prior to this" (the guardianship mortgage); while counsel for the State likewise on page 272 of his argument speaks of this mortgage as a fifth mortgage.

Specification IV. This refers to the guardianship mortgage dated March 14, 1925. What was said above as to Specifications II and III is also applicable to this specification.

Counsel for respondent at page 77 of his argument refers to this mortgage as having mortgages prior to it on the 291-acre tract for $16,000.00 and on the 90-acre tract for $4,750.00, and on the whole tract with others a blanket mortgage to Norwood National Bank totaling some $93,000.00 to margin cotton. The practical effect of the transaction, as pointed out above, was the execution and delivery of a fourth mortgage in order of priority on the whole tract to secure the guardianship bond.

Counsel for the State on page 27 of his argument properly refers to this mortgage as being subject to three prior mortgages securing *inter alia* a total indebtedness of over $114,000.00.

In connection with these specifications, respondent states in these petitions that "at no time did he give a fifth mortgage on any piece of land, at no time a fourth mortgage and only in the instance of two parcels of property could it be considered a third mortgage on that or any particular parcel of property." However, according to the record, the guardianship mortgage dated September 22, 1923, on the property known as the Masonic Temple lot was indisputably an unqualified fourth mortgage.

We are satisfied that the characterization of these mortgages in our opinion correctly presents their order of priority so far as the rights of the innocent ward are concerned. These objections exhibit a hypersensitiveness for technical accuracy that would better have been employed for the protection of the minor when the transactions occurred.

Specification V. Our opinion referring to the proceedings before the Sumter Bar Association used this language: "That association apparently took no action in the premises." At the hearing before us there was apparently some uncertainty as to what transpired before the Sumter Association as the records thereof and the resolution which was adopted were not presented. Respondent now attaches to one of his petitions a certified copy of the resolution which was adopted by the Sumter County Bar Association. We think that the opinion should be modified so as to show the exact nature of this resolution.

It is ordered, therefore, that the language of the opinion above quoted be stricken out and the following inserted in its place:

That association thereupon adopted the following resolution:

"Now, be it resolved that the Sumter County Bar Association unconditionally disapproves of the conduct of L. D. Jennings as shown by the record upon this investigation.

"Be it further resolved that the Sumter County Bar Association recommends that the filing of any charges based upon the matters and facts heretofore brought before it, or its committees, in connection with the aforesaid investigation, with the Grievance Committee of the State Bar Association, be postponed. This postponement is recommended in reliance upon the aforesaid unconditional assurance of the said L. D. Jennings that the methods and conduct herein disapproved shall immediately and completely terminate, and in the hope and belief that such postponement will have the effect of best promoting the interests of all parties concerned."

Specification VI. Objection herein is made to the following language of the Court: "Unfortunately for the minor, who became of age in October, 1930, his mother was surety on the guardian's bond. She, too, has lost heavily and is not able to respond financially."

While we are of the opinion that this language is a fair statement of the situation, amply borne out by the record itself, we can see that it might be misconstrued. The transactions between Mrs. Stubbs and respondent, of course, are not before this Court for review.

It is therefore ordered that the above language of our opinion be stricken out and in lieu thereof the following be inserted: "Unfortunately for the minor, who became of age in October, 1930, his mother was surety on the guardian's bond. She is not now financially responsible."

And it is so ordered.

EUGENE S. BLEASE, C. J.,
T. P. COTHRAN, J.,
JOHN G. STABLER, J.,
JESSE F. CARTER, J.,
JOHN I. COSGROVE, A. A. J.