## 17716

Howard L. Burns and Robert E. Vandiver, Complainants, v. F. Turner CLAYTON, Respondent. Howard L. BURNS and Robert E. Vandiver, Complainants, v. S. S. TISON, Jr., Respondent. Howard L. BURNS and Robert E. Vandiver, Complainants, v. L. C. WANNAMAKER, Respondent

(117 S. E. (2d) 300)

*Messrs. Daniel R. McLeod, Attorney General, James S. Verner* and *William F. Austin, Assistant Attorneys General,* of Columbia, *for Complainants,*

*Messrs. S. S. Tison, Sr.,* of Bennettsville, and *J. C. Hare* and *G. M. Howe, Jr.,* of Charleston, *for S. S. Tison, Jr.,*

*James P. Mozingo, III, Benny R. Greer* and *Archie L. Chandler,* of Darlington, *for F. Turner Clayton,*

*P. H. McEachin, Esq.,* of Florence, *for L. C. Wanna-maker.*

*Messrs. Samuel R. Watt,* of Spartanburg, *Thomas P. Stoney,* of Charleston, *John P. West,* of Camden, and *Edgar A. Brown,* of Barnwell, *as Amicus Curiae,*

November 19, 1960.

Per Curiam.

After hearings pursuant to our Rule on Disciplinary Procedure, the Board of Commissioners on Grievances and Discipline filed with this court its final certified report finding each of the respondents guilty of professional misconduct and recommending that the respondents Clayton and Tison be permanently disbarred and the respondent Wannamaker publicly reprimanded. The matter is now before us on that report and the respondents' returns to our orders requiring them to show cause, respectively, why the report of the Board should not be confirmed and disciplinary orders issued accordingly.

Respondents are members of the bar of South Carolina, separately engaged in the practice of law in this state. Complainants, members of the Board of Commissioners on Grievances and Discipline appointed by its Chairman for the purpose of investigation and prosecution pursuant to Section 31 of the Rule on Disciplinary Procedure, instituted a separate proceeding against each respondent; and by agreement the three proceedings were heard together before a panel of three members of the Board appointed by its Chairman pursuant to Section 9 of the Rule. The panel, after lengthy hearings, found each of the respondents guilty of misconduct warranting disbarment, and so reported to the Board. Thereafter, pursuant to an order of this court, the Board furnished to each respondent a copy of the hearing panel's findings of fact and recommendations, and accorded to them and their counsel a full hearing prior to its action thereon.

The voluminous record, which we have carefully examined, convincingly reveals the following facts:

On the afternoon of Sunday, November 24, 1957, at a point on the Ruby-Hartsville highway in Chesterfield County near Knight's store and filling station, a collision occurred between an automobile owned and driven by one Hazel Miles and a truck, the property of one J. L. Mills, driven by Joel Mills. Hazel Miles and the five other occupants of his automobile were killed. On the same day, the respondent Clayton was employed as attorney on behalf of Oscar Miles to represent the estates and statutory beneficiaries of his two children killed in the accident, and to seek recovery for their alleged wrongful deaths, said employment to be on a contingent basis that was subsequently fixed at forty per cent of any recovery. Thereafter Mr. Clayton was employed, on the same basis, to represent the estates and the statutory beneficiaries of the four other occupants of the car. On the evening of the same day, as the result of information received in his investigation of the collision, Mr. Clayton went to the home of one Ray Tyner, near Knight's store. Following a conversation with Tyner, he returned next morning,

met Tyner and three other young men, Laverne, Robert and McDonald Gooden, whom Tyner had assembled, and he then took the four of them to his office, where he had each of them execute in affidavit form a statement as to the facts surrounding the collision and the manner of its occurrence. These statements, which purported to place the full blame upon the driver of the truck, who was the only surviving eyewitness, were false in that each represented the person making it as having been an eyewitness, whereas in truth and fact he was not. They were procured by Mr. Clayton through the assistance of Tyner; and the evidence fully justifies the finding of the Board that Mr. Clayton had knowledge of their falsity. Upon their having made these statements Mr. Clayton paid in cash twenty dollars each to Tyner and the three Goodens. Additionally, for his services in making his false statement, in procuring the Goodens to make similar ones, and in keeping them committed to such statements and prepared to testify accordingly, he agreed to pay Tyner ten per cent of whatever fee he, Clayton, might receive for his representation of the estates and the statutory beneficiaries of the deceased persons in their claims arising out of the fatal collision.

Tyner was an uneducated man, thirty-three years of age at the time of the hearing before the panel Commissioners, unable to read or write except to sign his name, egotistical, self-important, garrulous, avaricious and unscrupulous. That something of his character was or should have been known to Mr. Clayton at the time of their interviews in November, 1957, is suggested by the fact that in May of that year Mr. Clayton, representing Tyner's wife in an action to annul their marriage, had obtained in the court of common pleas for Chesterfield County a decree of annulment reciting that the marriage had been obtained "by misrepresentation and/or fraud of the defendant." Laverne Gooden, aged twenty, Robert, aged twenty-one, and McDonald Gooden, aged eighteen, were young men of little education, their schooling having ended with the ninth grade.

Shortly after having executed his statement before mentioned, Laverne Gooden told his father of its falsity; and later he went with his father to the sheriff of Chesterfield County (who died prior to the hearing of this matter), and made like report to him.

Some two weeks after the accident, an insurance carrier covering the liability of the truck owner retained the law firm of Spruill and Harris, of Cheraw, to represent its interest in the matter. About a week thereafter, as the result of a report made to his firm by an adjuster for the insurance company, Mr. Spruill requested of the Governor that an agent of State Law Enforcement Division (SLED) be sent into the area to make an investigation; and during the week before Christmas, 1957, Officer McKinnan of SLED came to Mr. Spruill's office and conferred with him. Early in January, 1958, as the result of a statement made to him by the sheriff, Mr. Spruill requested that Officer McKinnan be sent back to investigate further.

On January 6, 1958, Officer McKinnan obtained from Ray Tyner an affidavit to the effect that he had not seen the accident occur, being at the time engaged with Laverne Gooden in work on the latter's car between Tyner's house and Knight's store; that on the evening of November 24, 1957, Mr. Clayton had come to his home and asked him to give a statement concerning the accident, saying that he wanted a statement showing Tyner to have been an eyewitness, and that he would pay Tyner well for it; that he did not give Mr. Clayton a statement that night, but "saw the other boy so we decided that we would give him a statement since he was willing to pay us"; that next morning Mr. Clayton returned to Tyner's house and took Tyner and the three Goodens to his office, where he fixed up the statements and had them typewritten; that at this meeting Mr. Clayton insisted that they lower their estimate of the automobile's speed as it passed Knight's store; and that after they had signed the statements he gave each of them twenty dollars and told them that they would receive more later.

On the same day, January 6, 1958, Officer McKinnan obtained from Robert and McDonald Gooden affidavits to the effect that at Mr. Clayton's request they, together with Laverne Gooden and Ray Tyner, had gone with him to his office on November 25, 1957, and had there made statements as to what they knew of the accident; and that after their statements had been typewritten Mr. Clayton had given to each of them twenty dollars, saying that it was for their time consumed in coming to Cheraw with him. The statements given by Robert and McDonald Gooden to Officer McKinnan made no reference to the truth or falsity of the statements that they had given to Mr. Clayton on November 25. But before the hearing panel Robert testified that he had not seen the accident happen, he and McDonald Gooden being at the time of its occurrence inside the Knight store; that he had heard the crash, but had paid no particular attention to it until someone outside hollered that a truck had turned over up the road. With regard to the conference in Mr. Clayton's office on November 25, he testified that he told Mr. Clayton that he had not seen the collision, but that Mr. Clayton dictated the statements as he wanted them, and gave each of the boys a copy, telling each to read and remember it. Similarly, McDonald Gooden testified that he was inside the store and neither saw the collision nor heard the crash; and that at the conference on November 25 he had told Mr. Clayton that he had not seen the accident.

On the same day, January 6, 1958, Officer McKinnan obtained from Laverne Gooden an affidavit, a copy of which came into Mr. Clayton's possession under circumstances hereinafter related and was introduced in evidence in the course of the cross examination of Mr. Clayton at the panel hearing. In this affidavit Laverne Gooden averred that the falsity of the statement that he had signed in Mr. Clayton's office on November 25 was revealed to him when, upon his return home, his father read to him the copy that Mr. Clayton had given him; and that he went on December 22 to the sheriff and told him that the statement was wrong. Further,

that at the conference on November 25 Mr. Clayton, who had made a sketch of the vicinity of the accident, had wanted him to indicate thereon that his car was at a point where in fact it was not, and that he had told Mr. Clayton that he could not do that. The affidavit also related the payment of twenty dollars each to Tyner and the Goodens after they had signed their statements; and that although Mr. Clayton told them that the money was for their time lost from work such was not actually the case, as neither Laverne nor Tyner lost any working time, Robert had no regular job, and McDonald was a schoolboy. Before the hearing panel, Laverne Gooden testified that when the collision occurred he and Tyner were behind the Knight store, working on Laverne's car; that he did not see the accident and that it would have been impossible for him to see it from where he was; that he heard the impact of the collision and then ran to the scene; that when he signed the statement in Mr. Clayton's office he did not know its contents; that Tyner had told him that he was to give Mr. Clayton a statement just like the one that Tyner would give, saying that he had seen the accident occur; that his statement was fixed up like that of Tyner, Mr. Clayton dictating it; and that after his father had read the copy of it that he had taken home he admitted its falsity to his father and later to the sheriff. He testified that when the SLED officer questioned him later he told the truth, which was that he had heard, but not seen, the collision.

The news that Laverne Gooden had given a statement to Officer McKinnan was not long in reaching Mr. Clayton. On the day of its execution a Mrs. Campbell (who did not testify) took a copy of it to Dr. J. A. Jones, a druggist in Chesterfield, who promptly telephoned to Mr. Clayton. That night Mr. Clayton took Tyner and Robert and McDonald Gooden in his Car to Dr. Jones' store, entering through the rear door, and there he had them jointly execute a statement written by him and purporting to be sworn to before Dr. Jones as notary, to the following effect: that when they and

Laverne Gooden were in Mr. Clayton's office on November 25 someone asked who was going to take care of their expenses, and that Mr. Clayton told them all that he could not and would not pay them for making their statements; that all he wanted them to do was to tell the truth; that he then asked each to tell what he knew about the accident, in the presence of his secretary, who wrote down what each said, typed it, and they each then signed their respective statements and were given a copy; that Mr. Clayton gave them nothing and promised them nothing; that the next time they saw Mr. Clayton was on December 22, 1957, when they, with Laverne Gooden, went to his office to tell him that the sheriff had sent word that there would be an inquest; that at that meeting Laverne told Mr. Clayton that he had given the sheriff another statement; that Mr. Clayton again several times told them all to tell the truth; that on this occasion also Mr. Clayton neither paid nor promised any of them anything; that he did tell Tyner that he had some extra Christmas presents and would give him one, but could not give the others anything because they were under age; that then they all drove in Tyner's car to Mr. Clayton's house, and he gave Tyner a bottle of whiskey; and that Mr. Clayton "never did anything except tell us to tell the truth, and he never gave us any money or promised us any money or other reward."

On January 7, 1958, Mr. Clayton actively associated with him as counsel in the pending matters Mr. L. C. Wannamaker, of Cheraw, and Mr. Sidney S. Tison, Jr., whose law office was in Hartsville but who remained also a member of the firm of Tison and Tison, of which his father was senior partner, and the office of which was in Bennettsville. Mr. Clayton testified that he had never contemplated handling the entire matter alone, particularly in view of the complexities that would attend the administration of the six estates within the same family and the distribution of the funds expected to be received; and that he had, prior to January 6, told Mr. Wannamaker that he would like to as-

sociate him in the matter and had asked him to see if the firm of Tison and Tison would also come in with them. And Mr. Wannamaker testified that prior to January 6 Mr. Clayton had associated him in the case and agreed that he (Wannamaker) should have the privilege of inviting also his close friend Mr. Sidney S. Tison, Sr. But there is no suggestion in the record before us that Mr. Wannamaker's association in the matter was activated, or that Mr. Sidney S. Tison, Jr. was even approached with regard to participation in it, until January 7, 1958, the day after Mr. Clayton, having learned of Officer McKinnan's activity, had procured from Tyner and Robert and McDonald Gooden, in Dr. Jones' drug store, the joint statement before mentioned.

On the morning of January 7, Messrs. Clayton, Wannamaker and Tison, Jr., met with the latter's father in his office in Bennettsville. Mr. Clayton showed them the copy of the statement that Laverne Gooden had given to Officer McKinnan the day before; and they discussed it and the presence of SLED in the area. That evening Messrs. Clayton, Wannamaker and Tison, Jr., went in the latter's automobile to Tyner's house. They took with them a dictaphone operable by electric current from the car's cigarette lighter; and they recorded on it a conversation between Mr. Tison and Tyner in which the former read aloud the affidavit that Tyner and Robert and McDonald Gooden had given in the drug store the night before; and Tyner, having been sworn by Mr. Tison, reaffirmed as true the statements contained therein.

From this point Mr. Tison, Jr. actively participated in handling preparations for trial, including the taking of photographs, the preparation of drawings and a model of the locus, the interviewing of Tyner and Robert and McDonald Gooden, and rehearsal of their testimony. The record indicates that Tyner made frequent demands upon Mr. Clayton for money, and that the latter delegated to Mr. Tison the task of keeping Tyner satisfied. Mr. Clayton denied having paid Tyner anything himself except that on two occasions after Tyner's house had burned he paid him twenty dollars.

Denying that he had ever instructed Mr. Tison to pay Tyner anything, he admitted that he knew that Tison was paying so that he would be available if and when the cases should come to trial; and he admitted that early in 1958, after Tyner had asked him to agree to pay him ten per cent of what he (Mr. Clayton) would get out of the matter, he had told Tyner, in order to get him out of his office, that it would be all right and he would take care of it. It appears further from Mr. Clayton's testimony that at the conclusion of a conference in the office of Mr. Tison, Jr., at which were present Mr. Clayton, Mr. Tison, Jr., Ray Tyner, and two of the Gooden boys, Tyner ushered the Goodens out, returned, and suggested that both Mr. Clayton and Mr. Tison agree to pay him ten per cent, to which Mr. Tison had replied that he was not going to get any of his part of it.

All claims arising out of the fatal accident of November 24, 1957, were settled without trial. The settlement, agreed to on January 9, 1959, and consummated in the latter part of the following month, was in the amount of $75,000, which was deposited in Mr. Wannamaker's personal account and disbursed by him. On February 25, Mr. Clayton and Mr. Tison met with Mr. Wannamaker in his office, and he delivered to each of them his check in the amount of $10,-000, representing their respective shares in the total fee of forty per cent, or $30,000.00, of the recovery. On this occasion Mr. Wannamaker inquired of Mr. Tison, who had been taking care of expenses as they arose, what his share was, to which Mr. Tison replied that $225.00 was as near as he could estimate it; and thereupon he paid Mr. Tison that amount. Previously, on July 24, 1958, he had paid to Mr. Tison $300.00 as contribution to the general expenses of the case. Mr. Tison having stated, in the conference of February 25, 1959, that there were some unpaid bills, including money owing Tyner, Mr. Wannamaker testified that after he had paid Mr. Tison $225.00 as his share he remembered that he had personally engaged a Mr. Hoover, an engineer of Cheraw, and had sent him to Mr. Tison; and that he then

asked Mr. Tison if the Hoover bill was included in his estimate of unpaid expenses, to which Mr. Tison had replied that he had forgotten about Mr. Hoover. Attempt was then made, without success, to reach Mr. Hoover by telephone and ascertain the amount of his bill; and it was agreed that $150.00 would be a proper charge, and that if he should approve it, Mr. Tison would pay it and Mr. Wannamaker would send his share, $50.00, to Mr. Tison, which he later did. Mr. Wannamaker testified, without contradiction, that he did not know how much Tyner was to be paid, and that he did not inquire as to what were items of expense to which he contributed.

Mr. Tison testified that when Tyner brought up, in his presence, the matter of his contributing toward the payment to him of ten per cent, he first told Tyner that he would not get any of his share, but later told him that he would contribute on the payment to him of ten per cent of what Mr. Clayton would get. Mr. Tison testified that after the conference with Mr. Wannamaker on February 25, 1959, he asked Mr. Clayton to find out from Tyner how much had been paid him, he (Tison) being under the impression that Tyner had receive about $400.00; and that Mr. Clayton then called Tyner and agreed with him on a further payment of $300.00 and told him to get it from Mr. Tison. Mr. Tison also testified that to the best of his recollection Tyner was paid at least $1,000 and probably nearer $1,100.00.

Mr. Spruill's first contact with Tyner was a day or so after Officer McKinnan's second visit, early in January, 1958, when he received a telephone call from one who introduced himself as Ray Tyner and said that he was calling from a filling station in Cheraw and that he wanted to talk with Mr. Spruill there. Mr. Spruill and his partner, Mr. Harris, then went to the filling station where Tyner's car was parked; and as the result of that and several later conversations with Tyner, Mr. Spruill and Mr. Harris took Tyner, on January 30, 1958, to the office of the circuit solicitor in Darlington. Tyner there related to the solicitor

what he had told Messrs. Spruill and Harris; and the next day, at the solicitor's request, the Chief of SLED sent to the solicitor a pocket-size tape-recording device, which counsel in their arguments before us refer to as a miniphone. On the night of January 31, Mr. Spruill and Mr. Harris again took Tyner to the solicitor's office and, the solicitor having instructed him as to its use, the miniphone, loaded with a three-hour tape, was delivered to Tyner. Thereafter Tyner on several occasions used this and another similar miniphone for the purpose of recording conversations between himself and Mr. Clayton and Mr. Tison concerning matters pending between him and them.

Portions of the tape-recordings so made by Tyner were played back during the course of the panel hearings. There were also introduced in evidence before the panel transcriptions of certain parts of them; and we note some discrepancies between two versions of the same part as transcribed by two disinterested witnesses. During argument before us these tape-recordings were played back, almost in their entirety, through a loud-speaker; and so heard, except for a few disconnected words here and there, we found them unintelligible. For this reason we have disregarded the tape-recordings and the transcriptions of them, and our decision in the instant matter has in nowise been influenced by them.

In our consideration of the record here we have amply discounted the testimony of Ray Tyner; and we have not overlooked the immaturity of the three Goodens, their evident acquiescence in being led into falsehood, and the vigorous attack upon their character by respondents' able counsel in scathing cross examination of them before the hearing panel and in argument before us. But despite these considerations, and apart from the tape-recordings before referred to, we are convinced beyond doubt from the record before us that the respondents Clayton and Tison were guilty of grave professional misconduct; the former in deliberately procuring false statements from prospective witnesses and in rewarding

his accomplice, Tyner, with a portion of his fee; the latter, after the false statements had been thus obtained, and with knowledge that Laverne Gooden had sworn to Officer Mc-Kinnan that they were false, by actively furthering the continuance of the respondent Clayton's professional misconduct, and by knowingly participating in the payment to Tyner of a portion of the fee.

The evidence does not, in our opinion, warrant a finding of professional misconduct on the part of the respondent Wannamaker. His association in the matter appears to have been for the purpose of exploring the question whether there might be liability, along with that of the owner of the milk truck, on the part of a large corporation engaged in the processing and distribution of milk, and also for the purpose of handling the complicated procedure and accounting incident to the administration of the estates of the six persons who had been killed in the accident. He did accompany the other respondents on their visit to and interview with Tyner on the night of January 7, 1958; but he does not appear otherwise to have participated with them in the actual preparations for trial, nor does it appear that he knew of the agreement between them and Tyner for payment of a part of the fee to the latter. The matter of paying expenses incident to investigation and preparation for trial had been left with Mr. Tison; and, so far as the record shows, Mr. Wannamaker had no reason to question the propriety of his disbursements or to require an accounting before making his contribution to them.

Counsel for the respondents Clayton and Tison earnestly contend that the findings and recommendations of the Board of Commissioners should be disregarded and the charges against these respondents dismissed; and in support of such contention they urge the following grounds:

1. That the Board erred in finding these respondents guilty of subornation of perjury, the complaints against them not having charged that offense and the evidence not warranting the finding that such offense had been committed.

2. That the Board erred in finding that the conduct of these respondents was in violation of the oath of office taken by them upon their admission to the bar of this State, the complaints not having so charged and the evidence not so warranting.

3. That since the complaints charged conspiracy and the Board acquitted the respondents of that charge, the Board's finding of misconduct was unsupported by the evidence.

4. That the evidence was insufficient to support the Board's finding that these respondents were guilty of violation of Canons 15, 32, 34 and 42 of the Canons of Ethics adopted by the American Bar Association and by this court.

5. That the Chairman of the Board should have disqualified himself.

6. That the miniphone tape-recordings, being fragmentary and unintelligible, should have been excluded from evidence before the hearing panel and from consideration by the Board.

7. That the admission of certain testimony of J. L. Mills, the owner of the milk truck, was erroneous and prejudicial.

The fallacy underlying these contentions is that they overlook the following fundamentals: that this is not a criminal proceeding nor an appeal from the judgment of a lower court; that the Board of Commissioners on Grievances and Discipline are officers of this court, commissioned and charged with the duty of investigating alleged misconduct on the part of their fellow members of the bar of this State and of reporting to this court the proceedings of their inquiry, and their findings and recommendations; that the Board's report is advisory only, this court being in nowise bound to accept its findings of fact or to concur in its recommendations; and upon this court alone rests the duty and the grave responsibility of adjudging, from the record, whether or not professional misconduct has been shown, and of taking appropriate disciplinary action thereabout.

The complaint against the respondent Clayton charged that he attempted to procure Tyner and the three Goodens

to give perjured testimony to the effect that they had witnessed the accident; that thereafter, in order to effectuate and establish the perjury thus originally conceived, he conspired with the respondents Tison and Wannamaker with a view to securing false statements from Tyner and Robert and McDonald Gooden to contradict a statement given by Laverne Gooden to an officer of South Carolina Law Enforcement Division; and that, pursuant to said conspiracy, the three respondents held meetings with Tyner and Robert and McDonald Gooden and paid them various sums of money and for his assistance in holding Robert and McDonald Gooden to their perjured testimony they agreed to pay and did pay Tyner a fee contingent on recovery, being ten per cent of the fee to be received by the respondent Clayton. The complaint against the respondent Tison charged him with the same conspiracy and the same acts in furtherance of it. The complaint in each case charged that the alleged acts of the respondent violated Canons 15, 32, 34 and 42 of the Canons of Professional Ethics of the American Bar Association, and were such as to pollute the administration of justice and bring the courts and the legal profession into disrepute.

That the complaints characterized the conduct of these respondents as conspiracy and the Board in its report characterized it as subornation of perjury, is a matter of no consequence in a proceeding of this kind, for such allegation and such finding were conclusional, not factual. For that reason, as well as because the Board's report is merely advisory, it matters not that the Board was in error in viewing respondents' conduct as constituting subornation of perjury. We note that the offense consists of two essential elements, *viz:* (1) procuring or inducing one to commit perjury, and (2) his commission of perjury, *State v. Sailor,* 240 N. C. 113, 81 S. E. (2d) 191; *Hammer v. United States,* 271 U. S. 620, 46 S. Ct. 603, 70 L. Ed. 1118; 41 Am. Jur., Perjury, Section 74; and that the second of these elements is lacking here because it does not appear that the

witnesses allegedly suborned actually swore falsely "in taking any oath required by law, administered by any person directed or permitted by law to administer such oath", Code 1952, Section 16-203.

Technical formality of allegation, as in an indictment, is not required in proceedings such as the present. All that is requisite to their validity is that the respondent be clearly apprised of the charges, *i. e.*, the facts upon which the claim of misconduct is founded, and that he be afforded reasonable opportunity for explanation and defense. 5 Am. Jur., Attorneys at Law, Section 291; *Randall v. Brigham*, 7 Wall. 523, 74 U. S. 523, 19 L. Ed. 285; *Herman v. Acheson*, D. C., 108 F. Supp. 723; *Phipps v. Wilson*, 7 Cir., 186 F. (2d) 748. The complaints here, plainly alleging the facts constituting the claimed misconduct, were served upon the respective respondents on May 22, 1959, and each of them duly answered; thereafter they were duly notified that the hearing before the panel of three Commissioners would be held on June 16, 1959; at that hearing they attended and heard the evidence against them, and their counsel cross-examined the complainants' witnesses; that hearing lasted through June 18, and thereupon a recess was ordered until August 3 to enable counsel to obtain and study the reporter's transcript of the proceedings before offering evidence for the respondents; and on August 3 the hearing was resumed and lasted until midday of August 5. As before stated, respondents and their counsel were afforded the opportunity to appear, and did appear and were heard, before the full Commission prior to its action upon the panel report; and in opposition to the report of the full Commission they have been fully heard by this court. The requirements of due process have been satisfied. *Ex parte Wall*, 107 U. S. 265, 2 S. Ct. 569, 27 L. Ed. 552.

Although the crime of subornation of perjury was not consummated, the attempt to commit it was in itself a crime, being an act done with the intention of preventing the due course of justice. *State v. Holding*, 1

McCord's Law 31, 12 S. C. L. 31. In *State v. DeWitt,* 2 Hill's Law, 282, 20 S. C. L. 282, 27 Am. Dec. 371, the defendants were indicted for a conspiracy to destroy the last will of a testator and thereby defraud the devisees. The court, declaring that all conspiracies to injure others and obstruct justice by the suppression or fabrication of evidence are indictable, said: "Attempts to suborn a witness to commit perjury or to prevent his giving evidence are offences against public justice; and there can be no well founded reason why the fabrication of evidence not involving perjury, or the destruction and suppression of that which is good, should not equally be so; they are alike calculated to pervert the public justice of the country, and to do individual injustice." And see also *State v. Cole,* 107 S. C. 285, 92 S. E. 624, where it was held that an agreement between the defendant in a criminal case and a prospective witness for the prosecution, whereby the latter, for fifteen dollars paid to him, would testify falsely in the defendant's behalf, was an indictable conspiracy.

But commission of a crime by a member of the bar is not prerequisite to the power of this court to disbar or suspend. The right to practice law is not an absolute one; as an officer of the court the lawyer's tenure is during good behavior; and the court that admitted him to practice has inherent power to remove him from office when by clear and convincing proof it has been shown that his conduct has been such as to evidence moral turpitude or tend to bring the courts and the legal profession into disrepute. *State v. Jennings,* 161 S. C. 263, 159 S. E. 627. As was said by the Nevada court, speaking through Justice Merrill in a matter having much in common with that now before us: "It is clear that subornation of perjury, tampering with witnesses or otherwise practicing deception upon a court by fraudulent devices is gross misconduct in the perverting or obstructing of justice and warrants disbarment." *In re Wright,* 69 Nev. 259, 248 P. (2d) 1080, 1083.

In effect, all contentions of the respondents Clayton and Tison have been disposed of by what has already been said. We shall, however, discuss briefly those addressed to the Board's finding that these respondents had violated their oaths of office and certain canons of ethics, to the admission of certain evidence, and to the alleged disqualification of the Chairman of the Board.

The oath taken by the respondents Clayton and Tison upon their admission to the bar of this State (in 1950 and 1948 respectively) was, in substance, that each was duly qualified according to the Constitution of this State to exercise the duties of the office of attorney at law; that he would, to the best of his ability, discharge the duties thereof and preserve, protect and defend the Constitution of this State and of the United States; and that he had not engaged, and would not during his term of office engage, in a duel. Maintenance of a proper standard of professional conduct was the first and highest duty that these respondents owed to their clients, to the courts, to their brethren at the bar, and to the people of this State. It was a duty required by the covenant to which they had bound themselves by their oaths of office.

Among the Canons of Professional Ethics adopted by the American Bar Association, Nos. 15, 32, 34 and 42 contain these declarations:

15. "The office of attorney does not permit, much less does it demand of him for any client, violation of law or any manner of fraud or chicane."

32. "No client * * * nor any cause * * * however important, is entitled to receive, nor should any lawyer render any service or advice involving disloyalty to the law * * *. When rendering any such improper service or advice, the lawyer invites and merits stern and just condemnation."

34. "No division of fees for legal services is proper, except with another lawyer, based upon a division of service or responsibility."

42. "A lawyer may not properly agree with a client that the lawyer shall pay or bear the expenses of litigation; he may in good faith advance expenses as a matter of convenience, but subject to reimbursement."

These canons, which we adopted in 1956 as a rule of this court, represent the consensus of the bar on the moral standard that lawyers in their practice should follow and uphold. In *Herman v. Acheson, supra,* the court said [108 F. Supp. 726]:

"Codes of ethics adopted by bar associations, of course, have no statutory force. They are indicative, however, of and reflect the attitude of the profession as a whole upon those courses of conduct which they frown upon and interdict, and they are commonly regarded by bench and bar alike as wholesome standards of professional ethics. The practice of law is a profession and not a trade."

The record here does not seem to involve Canon 42, since there is no evidence of any agreement between the respondent Clayton and his clients concerning payments to Tyner by the former or reimbursement therefor by the latter. But in our judgment it does clearly and convincingly show violation of the other three before mentioned, by the respondent Clayton directly and by the respondent Tison in the role of accessory.

Before the hearing panel, the respondents objected to admission of testimony of Mr. J. L. Mills, the owner of the truck, to the effect that on the day after the accident Tyner had shown him a copy of the statement that he, Tyner, had given to Mr. Clayton that morning, and had then told him that said statement was false and had been worded by Mr. Clayton to suit his purpose, with knowledge of its falsity. Here it is contended that there was prejudicial error in the admission of such testimony and in its consideration by the Board in its review of the panel's report.

> Where the credit of a witness has been impeached by proof or imputation that he has made declarations inconsistent with what he has sworn to, an exception

to the hearsay rule permits proof of his declarations, consistent with what he has sworn to, made on other occasions prior to the existence of his relation to the cause. For example, in *Lyles v. Lyles,* 1 Hill's Eq. 76, 10 S. C. Eq. 76, where the issue was whether in 1817 J. was alive, D., a witness for the defendants, testified that he had seen J. in Mississippi in that year, and that he was at that time alive and well. Another witness, Lucy Farr, testified that she had been present when one Elizabeth Brown had inquired of D. if he had recently seen J., and that in that interview D. at first did not appear to have answered in the affirmative, but later, after a private interview with Elizabeth Brown, D. had stated that he had seen J. The witness Lucy Farr testified further that Elizabeth Brown had told her that she, Elizabeth, was to be well paid by one of the defendants if she could find a person who would swear that J. was alive at the time in question, and that D. would be well paid by said defendant for so testifying; and that the witness did not believe that D. had ever seen J., but believed that he had been prevailed upon by Elizabeth to swear that he had. The defendants then offered one Nathan Vincent to prove that he had heard D. say, in the latter part of 1817, after his return from the Mississippi, that he had seen J.; and on appeal it was held that this testimony should have been admitted.

In the instant matter, respondents in their cross examination of Tyner vigorously impeached his credibility, suggesting, among other things, that his testimony concerning the falsity of the statement procured from him by Mr. Clayton on November 25 was not worthy of belief because it was given in consideration of money or promises or favors given to him by a representative of the insurance company, or by others concerned with this proceeding, and because it was in conflict with statements previously made by him. Mr. Mills' testimony as to a declaration made to him by Tyner prior to Tyner's relation to the instant matter, and indeed prior to Tyner's affidavit to McKinnan, was properly admitted as corroborative both of that

affidavit and of Tyner's testimony. *Lyles v. Lyles, supra; State v. McDaniel*, 68 S. C. 304, 47 S. E. 384, 102 Am. St. Rep. 661. We may add that we would reach the same conclusion from the other evidence in this record without regard to Mr. Mills' testimony.

■ We do not agree with the contention that the Board of Commissioners erred in refusing to disqualify its Chairman upon the ground that prior to the commencement of the hearings he had participated in the investigation of the complaints, had listened to certain of the miniphone recordings, and had discussed certain of the evidence with the witness Tyner. Section 31(a) of the Rule on Disciplinary Procedure reads as follows:

"Whenever, from sources deemed by him reliable, the chairman of the Commission learns of an attorney (who is licensed to practice in South Carolina) engaging in practices in violation of his duty as such attorney, and the Chairman comes to the conclusion that an investigation should be made, he shall designate one member of the Commission to act as an investigator. The member so designated shall investigate these reported violations of duty, and for this purpose he may call to his assistance such public investigating agencies as he may think proper. After making such investigation, should the investigator come to the conclusion that a complaint (as described in section 7 hereof) should be made against the attorney investigated he shall file such in his official capacity and be responsible for the prosecution thereof to a conclusion."

The record here discloses that the Chairman, having received a report of misconduct on the part of the respondents, listened to one of the recordings and talked briefly with Tyner in order to ascertain whether or not there was sufficient ground for the appointment of one or more members of the Commission to act as investigators. There is no suggestion that he did more than that; in order to discharge intelligently his duty under the section of the Rule just quoted, he could hardly have done less.

The Chairman of the Board of Commissioners, a distinguished lawyer of unimpeachable integrity, was also a member of the hearing panel, over which he presided. When respondents' counsel moved before the Board of Commissioners for his disqualification he stated that the preliminary inquiry before mentioned had not resulted in his forming any opinion as to respondents' guilt or innocence. The Board ruled that he was not disqualified, and we find no error in such ruling. Of the fourteen members of the Board of Commissioners (one from each judicial circuit), ten sat to consider the report of the hearing panel; two, the complainants herein, were disqualified under the rule; the Commissioner from the judicial circuit in which the respondents reside disqualified himself voluntarily, and so also did another Commissioner, whose firm had been of counsel in the litigation out of which the charges against the respondents arose. The ten Commissioners who sat, and whose report is now under review, were unanimous in finding the respondents guilty of misconduct; one stated that he considered the penalties recommended by the others too severe, and that therefore he could not join in that recommendation. No prejudice has been shown. In *Phipps v. Wilson, supra,* upon similar contention against the procedure under the disciplinary rule of the Illinois Supreme Court, whereby committees of the Chicago Bar Association as commissioners of that court had investigated charges of misconduct and had recommended disbarment, the court held that no substantial question under the due process clause of the Federal Constitution was raised. It was there pointed out, as we have emphasized here, that such commissioners are merely agents of the court for the purpose of gathering and reporting the evidence, and that their recommendations are purely advisory.

The return of the respondent L. C. Wannamaker is adjudged sufficient, and the charges against him are dismissed.

Because this matter is the first of its kind under the recently adopted Rule on Disciplinary Procedure, and because

of the laxity and inefficiency of procedures heretofore existing for dealing with professional misconduct, we feel justified in not invoking the extreme penalty of disbarment in the case of the respondent Clayton, or the penalty of indefinite suspension in the case of the respondent Tison. Our leniency is not to be understood as implying that their misconduct does not warrant such penalties; rather it is intended as a warning that it may not be expected in the future, and as an expression of hope that the penalty that we now impose upon them respectively will suffice to cause each to understand and uphold hereafter that standard of conduct demanded by the very nature of the legal profession and its relationship to the courts and the public.

The respondent F. Turner Clayton is indefinitely suspended from the practice of law in this State. He shall forthwith surrender to the clerk of this court the certificate heretofore issued by this court admitting him to practice.

For his acts of misconduct before mentioned the respondent S. S. Tison, Jr., stands publicly reprimanded by this court.

Let this order be published with the opinions of this court.

And it is so ordered.