589 S.E.2d 188

**In the Matter of John C. BROOME, Respondent.**

No. 25748.

Supreme Court of South Carolina.

Heard Sept. 23, 2003.

Decided Nov. 10, 2003.

304

Attorney General Henry Dargan McMaster and Assistant Deputy Attorney General J. Emory Smith, Jr., both of Columbia, for The Office of Disciplinary Counsel.

Carol S. Broome, of Columbia, for Respondent.

 

## DEFINITE SUSPENSION

PER CURIAM:

In this attorney-disciplinary matter, the Sub Panel of the Commission on Lawyer Conduct found, and the Full Panel agreed, that John C. Broome ("Respondent") committed misconduct and recommended that he receive a public reprimand and pay proceeding costs. We find that the gravity of Respondent's misconduct justifies harsher sanctions. Therefore, we hereby suspend Respondent for 90 days, order him to pay proceeding costs, and require that he be re-examined by the Committee on Character and Fitness before he may reactivate his license to practice law.

### FACTUAL/PROCEDURAL BACKGROUND

This attorney-disciplinary case arises from Respondent's conduct in three separate matters: (1) adoption-related proceedings; (2) a custody dispute ("Sparks matter"); and (3) a divorce action ("Jones matter"). Respondent's conduct in the adoption-related proceedings is the most serious, most factually complex of the three matters.

### A. ADOPTION-RELATED PROCEEDINGS

The same adoptive child is the subject of three distinct adoption-related proceedings. Mr. and Ms. Roe[1] filed the first action ("Adoption # 1") as a married couple seeking to adopt the infant child. A few months later, alleging that Mr. Roe had abused the child, Ms. Roe moved out of the marital home, took the infant child with her, and then filed the second action ("Support Action"), seeking separate maintenance and support and temporary custody. Shortly thereafter, Ms. Roe filed the third action ("Adoption # 2"), seeking to adopt the child as a single parent.

Respondent represented Ms. Roe in both the Support Action and Adoption # 2. In short, Respondent initiated Adoption # 2 while Adoption # 1 was pending and did not notify

---

1. The name "Roe" is used to protect the parties' identities, given that the underlying action is an adoption proceeding. On May 21, 2003, this Court ordered that portions of the record referring to the adoption proceeding be sealed.

the Adoption # 1 parties that he had done so. Throughout, Respondent handled Adoption # 2 as if it were an independent action, unrelated to Adoption # 1, even though the very same child, birth parents, and prospective adoptive parents had a stake in each matter.

## 1. TIMELINE

The following timeline illustrates the interplay among the three adoption-related proceedings:

Apr. 23, 1998 Adoption # 1 (Case No. 1766) filed in County X [2] by Mr. and Ms. Roe to adopt infant child.

Aug. 12, 1998 Ms. Roe filed Support Action (purportedly *pro se* but with documents prepared by Respondent) in County Y.[3]

Aug. 27, 1998 Upon learning that the Roes had separated, the birth parents' attorney, Sam Crews, wrote a letter to Respondent and other counsel requesting that the child be returned to the birth mother for temporary placement with the birth mother's relatives. (A few days later, Respondent filed Adoption # 2 in direct opposition to this request.)

Aug. 31, 1998 Final hearing in Adoption # 1 continued until November 1. (This continuance made it possible for Respondent to go forward with plans to file Adoption # 2, contravening the birth mother's wishes as detailed in the August 27, 1998 letter from Sam Crews.)

Ms. Roe filed a Notice of Dismissal "as to [her]" (purportedly *pro se* but with documents prepared by Respondent) in Adoption # 1 but did not serve the other parties until November 6, 1998.[4]

---

**2.** "County X" is used to maintain confidentiality.

**3.** "County Y" is used to maintain confidentiality.

**4.** Judge Brown deduced that the only reason Ms. Roe filed her notice of dismissal in Adoption # 1 was so that she could proceed with having Adoption # 2 filed, without her husband. And when asked whether he knew if Ms. Roe had served the notice at the time it was filed, Respondent said that he never inquired, and he assumed that she had served it.

Ms. Roe signed the complaint for Adoption #2 with Respondent as counsel.

Sept. 3, 1998 Complaint in Adoption #2 filed but not served on Mr. Roe, his counsel, the guardian *ad litem*, or the birth parents. Complaint fails to make any reference to pending Support Action and states that Adoption #1 was dismissed "as to [Ms. Roe]."

Sept. 8, 1998 Hearing held in Support Action. Respondent did not inform Judge Nuessle that Adoption #2 had been filed.

Sept. 24, 1998 Judge Nuessle granted Ms. Roe temporary child custody. Birth mother given 30 days to intervene in Support Action.

Oct. 16, 1998 Final hearing held in Adoption #2 before Judge Brown. While Ms. Roe was on the witness stand, Respondent asked her whether Adoption #1 "was dismissed by [her]" to which she answered, "Yes." Without knowledge that Adoption #1 and Support Action were pending, Judge Brown issued an order of adoption to Ms. Roe.

Nov. 6, 1998 Ms. Roe finally served parties with Notice of Dismissal *as to her* only in Adoption #1.

Nov. 9, 1998 Respondent filed a Notice of Representation in Adoption #1.

Nov. 13, 1998 Attorney for birth parents (Sam Crews) wrote letter to Judge Brown requesting that Adoption #2 be re-opened and an emergency hearing held.

Hearing held before Judge Riddle in Adoption #1 in what should have been a final hearing in that case. But then Respondent announced that Ms. Roe already adopted the child in Adoption #2.

Nov. 17, 1998 Hearing held in Support Action before Judge Sawyer. Judge Sawyer held the proceeding in abeyance until Judge Brown had an opportunity to re-hear the matter.

Nov. 20, 1998 Hearing held before Judge Brown in Adoption #2 to re-hear order of adoption previously granted to Ms. Roe.

Nov. 23, 1998 Judge Riddle issued order continuing Adoption # 1 once again and requiring that the contents of the Adoption # 2 proceeding be unsealed to allow the guardian *ad litem* to review the case.

Dec. 10, 1998 Judge Brown vacated the order of adoption he issued in Adoption # 2 finding (1) lack of notice to necessary parties; (2) Adoption # 1 was still pending; and (3) lack of notice to court that Adoption # 1 and Support Action were pending.

## 2. FAILURE TO INFORM THE COURT

This Court finds that on at least four different occasions in front of four different judges, Respondent engaged in deceitful conduct. The conduct in Adoption # 2 is outlined first and most thoroughly, since it is the focus of the parties' briefs.

### a. JUDGE BROWN, ADOPTION # 2

The Office of Disciplinary Counsel ("ODC") and Respondent center their discussion of the adoption-related proceedings on Respondent's failure to inform the court in Adoption # 2 that Adoption # 1 and the Support Action were pending. Respondent had two opportunities to inform the Adoption # 2 court: (1) in the complaint and (2) at the final hearing for adoption.

In the complaint, Respondent referred to Adoption # 1 in two separate paragraphs. Paragraph 6 states, "[a]n action for adoption of the minor child was filed in [County X] as File No. 98–DR–40–1766. This plaintiff has had that action *as to her* dismissed as more fully set forth herein." (emphasis added). Also, Paragraph 16 states:

A previous action for adoption was filed under File No. 98–DR–40–1766 on April 23, 1998, which was within 60 days of placement as required by statute, by this Plaintiff and her now estranged husband, however due to his abusive behavior toward the baby, the Plaintiff determined that for her safety and the safety of the child, and the impossibility of an adoption by both under the circumstances, that the action *as to her* should be dismissed and an [sic] new action begun with this plaintiff alone.

(emphasis added). Respondent argues that these references to Adoption # 1 sufficiently informed the court that Adoption

# 1 remained viable. Further, he argues that the onus was on the court to determine the status of Adoption # 1 and to inquire as to whether any other action concerning the child or parties was pending. But ODC argues that these references fall short of informing the court that Adoption # 1 was pending as to other parties.

If there was any confusion concerning the status of Adoption # 1 from language in the complaint, that confusion could have been clarified in Respondent's direct examination of Ms. Roe during the final hearing in Adoption # 2. When Ms. Roe was on the witness stand, Respondent asked, "was [Adoption # 1] dismissed by you?" to which Ms. Roe replied, "Yes, sir, it was." Judge Brown relied on this testimony and thus believed Adoption # 1 had been dismissed in its entirety.

Respondent also failed to inform the court—both in the complaint and at the final hearing—that the Support Action was pending, even though Respondent was the attorney of record and had appeared in that case. He argues that he was not required by law to disclose the action in the Adoption # 2 complaint because the court in the Support Action had yet to issue an order affecting custody.[5] In addition, Respondent argues that he did not entirely fail to inform the court because the Adoption # 2 complaint and its attached reports explained that Ms. Roe was estranged from her husband, suggesting a Support Action of sorts might exist.

Respondent also failed to inform the court in Adoption # 2 (1) that a guardian *ad litem* had already been appointed for the child in Adoption # 1; (2) that the natural parents had asserted an interest in the child; and (3) that Mr. Roe had not taken legal action to terminate his desire to adopt the child.

Based on the record and the testimony at the October 16, 1998 final adoption hearing in Adoption # 2, Judge Brown issued an order of adoption to Ms. Roe as the sole adoptive parent. But shortly thereafter, Mr. Roe brought a motion to vacate, and upon rehearing the matter, Judge Brown vacated this order finding (1) that the court was misled as to Adoption # 1's status, (2) that the court was not informed about the

---

**5.** Throughout, Respondent supports his course of action by asserting that Adoption # 1 and Adoption # 2 were entirely separate matters, and he proceeded with Adoption # 2 accordingly.

Support Action, and (3) that Mr. Roe, the birth parents, and the guardian *ad litem* appointed in Adoption # 1 were necessary parties to Adoption # 2. Judge Brown also declared that Respondent and his client had demonstrated "a willful and flagrant disregard for their statutory and ethical duties to [the] court." Finally, Judge Brown ordered Respondent and Ms. Roe to pay $5,000 in fees.

### b. JUDGE NUESSLE, SUPPORT ACTION

On September 8, 1998, Respondent appeared at a hearing in the Support Action before Judge Nuessle. At the time he appeared, Respondent had already filed Adoption # 2, but he did not inform Judge Nuessle of this fact. Not knowing that Adoption # 2 existed, Judge Nuessle issued an order on September 24, 1998, granting temporary custody to Ms. Roe. Just two weeks after obtaining this order, Respondent appeared in the final hearing for Adoption # 2 before Judge Brown. As outlined above, Respondent never mentioned the existence of the Support Action or the recently-obtained order to Judge Brown.

### c. JUDGE RIDDLE, ADOPTION # 1

On November 13, 1998, Respondent appeared before Judge Riddle at what was supposed to be the final hearing in Adoption # 1. But as soon Judge Riddle learned that the child had already been adopted in Adoption # 2, she spent much of the hearing trying to determine how this could have happened while Adoption # 1 was pending. Respondent did little to clarify the confusion. Although he rightfully refused to reveal the facts of Adoption # 2 (since the record was sealed), he told Judge Riddle that "an adoption was properly done." In addition to withholding the facts, he refused to provide the other attorneys with the Adoption # 2 caption and case number, preventing them from knowing where and how to intervene.[6] Judge Riddle was forced to order Respondent into her chambers to gather the information necessary for her ruling.

---

6. Judge Riddle eventually ruled that the law did not permit her to require Respondent to disclose the caption and case number of Adoption # 2. The parties would therefore have to file yet another motion just to learn the caption and case number.

#### d. Judge Sawyer, Support Action

On November 17, 1998, Respondent appeared at a hearing in the Support Action before Judge Sawyer. Just as he did with Judge Riddle, Respondent evaded Judge Sawyer's questions by stating that the Adoption # 2 proceedings were sealed. Based on the record before him, Judge Sawyer stated that he was "concerned from an ethical, a legal, and criminal standpoint" about the issues before the court. He explicitly asked Respondent if Respondent informed Judge Brown that Adoption # 1 was pending. Respondent answered, "Yes, your honor." In closing, Judge Sawyer stated, "this is a matter of grave concern certainly not only to the court, not only to [him], but also to the attorneys and litigants."

### 3. Failure to Notify Interested Parties and Counsel

In addition to failing to fully inform the various courts in the adoption-related proceedings, Respondent failed to inform interested, necessary parties that Adoption # 2 had been filed. Such parties included Mr. Roe, the birth parents, the guardian *ad litem*, and the parties' counsel.

Respondent admitted that he did not provide these parties or their counsel with notice. He justified his course of action by arguing that Adoption # 2 was an entirely separate matter than Adoption # 1. Because they were not parties to Adoption # 2, he argued, they were not entitled to notice. But given that all three actions involved the same parties, Adoption # 2 can hardly be considered a "separate matter" to which these parties were not entitled notice.

### 4. Failure to Abide by the Birth Mother's Wishes[7]

Finally, Respondent directly contravened the birth mother's wishes to have the child adopted by a two-parent family—specifically Ms. and Mr. Roe—as designated in her consent and waiver. He attached the very same consent and waiver forms executed for Adoption # 1, an adoption by a two-parent family, in Adoption # 2, an adoption by a single parent. In addition, he claimed that he did not notify the birth parents

---

7. This issue is not a part of the Sub-Panel Report or the briefs but is included here in support of this Court's decision.

that he filed *Adoption # 2* because they waived their rights to notice and to being named as parties in their consents. Once the birth parents (and particularly the birth mother) learned of the Roes' separation, they attempted to intervene in the Support Action. But because *Adoption # 2* ended before they knew it had begun, they were unable to intervene in that action.[8]

## B. SPARKS MATTER

Respondent met with Joanne Sparks during the initial stages of a custody action. While Respondent dealt with Sparks, the time to respond to the summons and complaint in the custody action expired, and opposing counsel filed an affidavit of default. After Sparks went into default, Respondent attempted to back out of his relationship with Sparks, stating that he could "no longer provide any further services to Ms. Sparks until [he] received a written employment agreement." In addition, Respondent argues that Sparks never gave him the authority to prepare pleadings; rather, she consulted him solely for the purpose of investigating her options for settlement.

At the Sub–Panel hearing, Respondent claimed that Sparks was not his client at the time the response became due. He further testified that a note he penned to another attorney referring to Sparks as "my client" was written in error. Sparks never signed a retainer agreement and did not testify at the Sub–Panel hearing.

## C. JONES MATTER

Respondent represented Charlotte Jones in a divorce matter. Over the course of two years, Respondent was unable to obtain a divorce or settlement agreement on Jones's behalf.

Respondent argues that the delays in this matter were due to Jones's difficulties with her husband and her uncertainties as to how she wanted to proceed. He argues that he did not

---

8. The birth parents eventually intervened in the Support Action, and on June 28, 1999, Judge Nuessle issued an order approving an agreement naming Mr. and Ms. Roe as the adoptive parents (in accordance with the birth parents' wishes). But due to the adoptive parents' separation, Ms. Roe was given custody and Mr. Roe was given visitation rights.

secure court approval of the settlement agreement because the parties were unable to agree on final terms.

But at the Sub–Panel hearing, Jones testified (1) that she did not understand why her divorce action could not go forward, (2) that she did not hear from Respondent for months at a time, and (3) that Respondent's paralegal seemed to know more about the case than he did.

Based on the lack of results, Jones filed a claim with the Fee Disputes Board ("Board") alleging that Respondent overcharged her and that she "got no agreement and no divorce." The Board denied Jones's request for a refund of fees, even though the Board found that there was "a hiatus in file activity" for seven months.[9]

Respondent argues that the rehearing of these issues constitutes *res judicata*. But the Board and Commission on Lawyer Conduct investigations are separate matters. The Board conducted its investigation for the purpose of determining whether Respondent had overcharged Jones. Here, the issues are whether Respondent acted diligently, kept his client informed, and provided competent representation.

### D. SUB-PANEL HEARING AND REPORT

The Sub–Panel filed its report on April 30, 2002. On July 24, 2002, the Full Panel adopted the Sub–Panel report in its entirety, making changes only to protect the confidentiality of the parties in the adoption proceedings.

In its report, the Full Panel stated that it had "carefully reviewed [the Sub–Panel Report], the Objections to it filed by [Respondent], and the Return filed by counsel for Office of Disciplinary Counsel" before coming to a unanimous decision to adopt the Sub–Panel Report in full. (July 26, 2002 Full Panel Report incorrectly titled "Sub–Panel Report"). Because the Full Panel did not specify that it had also reviewed the "record" in making its findings, Respondent argues that the Full Panel therefore failed to review the hearing transcript, adopting the Sub–Panel Report without knowledge of the necessary facts, and thus violated Rule 26(c)(7) of *Lawyer Disciplinary Enforcement*, Rule 413, SCACR.

---

9. Jones never appealed the Board's findings.

Rule 26(c)(7) provides, in part, that the Full Panel "shall review the [Sub–Panel's] report and record, and make its own report. . . ." In response to Respondent's argument, ODC points out that simply because the Full Panel did not enumerate that it had reviewed the "report and record" does not necessarily mean that the Panel failed to review the hearing transcript. ODC also argues that Rule 26(c)(7) does not compel the Panel to read each and every page of the transcript; rather, a review of the "report and record" may be accomplished without reading each and every page of the transcript.

## LAW/ANALYSIS

As to the adoption-related proceedings, the Sub–Panel found, and the Full Panel agreed, that Respondent violated the following from the *Rules of Professional Conduct*, Rule 407, SCACR: (1) Rule 8.4(d) (engaged in conduct involving deceit and misrepresentation); (2) Rule 8.4(e) (engaged in conduct that is prejudicial to the administration of justice); and from *Lawyer Disciplinary Enforcement*, Rule 413, SCACR, (3) Rule 7(a)(5) (engaged in conduct tending to pollute the administration of justice or to bring the courts or legal profession into disrepute and engaged in conduct demonstrating unfitness to practice law). We agree.

■ In our opinion, Respondent proceeded with Adoption # 2 in a manner that deceived the court and that prejudiced and polluted the administration of justice. We acknowledge that Respondent referenced Adoption # 1 in the complaint, but he crafted the language in such a way that the court was misled as to the status of Adoption # 1.

Paragraph 6 of the complaint stated that a previous action for adoption had been filed and that Ms. Roe "had that action as to her dismissed as more fully set forth herein." Standing by itself, this paragraph did not explain the status of Adoption # 1. Even if the reader caught the "as to her" language, he still would not know—unless he inferred it—that Adoption # 1 remained viable as to other parties. Moreover, Paragraph 6 directed the reader to what was "more fully set forth herein" to learn the rest of the story.

The rest of the story appears ten paragraphs later in Paragraph 16. Paragraph 16—the second and final time Adoption # 1 is referenced—stated once again that a previous action for adoption was filed. As in Paragraph 6, this language made it clear that another action was filed, but it did not clarify the status of that action. Also as in Paragraph 6, Respondent used the "as to her" language to support his contention that the court should have known that the Adoption # 1 action remained viable. But what was remarkable here was that the "as to her" language followed language concerning child abuse, a mother's panic, and a sense of urgency. Respondent knew that no court would have allowed Adoption # 2 to go forward without informing the parties to Adoption # 1, and so it is inferable that he crafted the language accordingly and placed it at the end of an emotionally-charged paragraph.

Even if we accepted that Respondent informed the court in the complaint as to the status of Adoption # 1, he directly misled the court at the hearing, asking his client whether Adoption # 1 had been dismissed, not whether it had been dismissed "as to her." When Ms. Roe answered that it had, any confusion the court may have had from reading the complaint was clarified: Adoption # 1 had been dismissed *in its entirety*. Although Respondent argues that he simply erred in omitting "as to her" during the direct examination, he cannot convincingly rely on the "as to her" language in one instance (in the complaint) and then overlook it in the next instance (at the hearing).

Finally, Respondent made no reference whatsoever—in the complaint or at the hearing—to the Support Action. Again, he knew that revealing such information would prevent Adoption # 2 from going forward.

Throughout his representation of Ms. Roe in Adoption # 2, Respondent had the opportunity and the ethical duty to clarify the status of Adoption # 1 and the existence of the Support Action so that the court could make an informed decision. Respondent did neither. Finally, Respondent's failure to notify the interested parties that Ms. Roe was filing an action on her own to adopt the very same child at issue in Adoption # 1

confirms his intent to proceed without interference from what he knew to be interested parties.

As to the Sparks matter, the Sub–Panel found that Respondent violated the following from the *Rules of Professional Conduct,* Rule 407, SCACR: (1) Rule 1.3 (failed to act with reasonable diligence and promptness in representing a client); (2) Rule 1.1 (failed to represent a client competently); and (3) Rule 1.16 (terminated representation without taking steps to protect client interests). We agree.

That Respondent consulted with Sparks about her settlement options, communicated on her behalf on more than one occasion, and referred to her as "my client" on at least one occasion, is enough to create an attorney-client relationship. *See Marshall v. Marshall,* 282 S.C. 534, 539, 320 S.E.2d 44, 47 (Ct.App.1984) (finding that "[a] person attains the status of 'client' when that person seeks legal advice by communicating in confidence with an attorney for the purpose of obtaining such advice"). Moreover, a signed retainer agreement is not essential to create such a relationship. *See* 7 Am.Jur.2d *Attorneys at Law* § 136 (2003). Therefore, by allowing Sparks to go into default without taking action to protect her interest, we find that Respondent has violated Rules 1.3, 1.1, and 1.16 as enumerated in the Sub–Panel Report.

As to the Jones matter, the Sub–Panel found that Respondent violated the following from the *Rules of Professional Conduct,* Rule 407, SCACR: (1) Rule 1.3 (failed to act with reasonable diligence and promptness in representing a client); (2) Rule 1.4(a) (failed to keep a client reasonably informed about the status of a matter and comply promptly with reasonable requests for information); and (3) Rule 1.1 (failed to represent a client competently). We agree.

Given Jones's testimony and the fact that Respondent obtained no results for his client over a two-year period, we find that Respondent failed to act diligently and competently in this matter.

Finally, Respondent's contention that the Full Panel did not review the report and record before making its decision is without merit. This Court is not confined to the Sub–Panel or Full–Panel findings. *Burns v. Clayton,* 237 S.C.

316, 331, 117 S.E.2d 300, 307 (1960). Indeed, this Court is required to conduct *its own* thorough review of the record and then render an appropriate sanction. *Matter of Kirven,* 267 S.C. 669, 670, 230 S.E.2d 899, 900 (1976) (emphasis added). Moreover, this Court "may accept, reject, or modify in whole or in part the findings, conclusions and recommendations" of the Full Panel. Rule 27(e)(2), *Lawyer Disciplinary Enforcement,* Rule 413, SCACR. Given its authority and given that this Court has reviewed the record in its entirety, we hold that Respondent's argument that the Full Panel failed to conduct a thorough review of the record before making its decision is unfounded.

### SANCTIONS

Because of the seriousness of the misrepresentations in the adoption-related proceedings, the Full Panel recommended that Respondent be publicly reprimanded. The Full Panel also recommended that Respondent pay proceeding costs. In our opinion, these sanctions are appropriate *at a minimum.*

■ This Court has deemed public reprimand the appropriate sanction in cases involving deceit. *See Matter of Gregg Jones,* 344 S.C. 379, 544 S.E.2d 826 (2001) (attorney refrained from recording a series of deeds so that a husband would not learn that his wife had sold the property and did not tell subsequent buyers that the property carried an outstanding mortgage); *Matter of Celsor,* 330 S.C. 497, 499 S.E.2d 809 (1998) (attorney falsely notarized client's signature and submitted such falsified documents to the court); *Matter of Bruner,* 321 S.C. 465, 469 S.E.2d 55 (1996) (attorney's misrepresentations to title insurer stemmed from lackadaisical and mismanaged office practices); *Matter of Blackmon,* 295 S.C. 333, 368 S.E.2d 465 (1988) (attorney inadvertently signed his name on judge's signature line on a motion, filed the motion, and then misrepresented the situation to the investigator at the Attorney General's office).

But unlike the cases outlined above, the present case involves multiple instances of deceit *before judges.* Because there is no South Carolina case on point, this Court has looked to cases from other states for guidance.

The Supreme Court of Arizona recently imposed a six-month suspension in a case where two attorneys (1) conducted a "sham" trial; (2) misled the judge by deliberately concealing the existence of an out-of-court agreement; (3) evaded the trial court judge's questions; and (4) deceived the trial judge with "answers that purposefully disguised the true situation when a 'lawyer of reasonable prudence and competence' would have known that the judge's inquiry required disclosure." *Matter of Alcorn*, 202 Ariz. 62, 41 P.3d 600, 611 (2002).

The Supreme Court of Washington suspended an attorney for 60 days for misrepresenting facts to a court in *ex parte* proceedings. *Matter of Carmick*, 146 Wash.2d 582, 48 P.3d 311 (2002). The Court noted that:

An attorney's duty of candor is at it highest when opposing counsel is not present to disclose contrary facts or expose deficiencies in legal argument. Such a high level of candor is necessary to prevent judges from making decisions that differ from those they would reach in an adversarial proceeding.

*Id.* at 318.

Taking an even stricter stance than the Arizona and Washington courts, the Supreme Court of Georgia disbarred an attorney (1) for telling a client that he had re-filed a claim when he never had and (2) for presenting two falsified client letters and postal receipts to the investigative panel to support his position. *Matter of Shehane IV*, 276 Ga. 168, 575 S.E.2d 503 (2003). Disbarment was warranted even though this was the attorney's first instance of discipline. *Id.* at 504.

In the present case, Respondent evaded judges' questions and in some instances, directly misled the court. Respondent's duty of candor was at its highest in the Adoption # 2 final hearing, and it was at this hearing that he most noticeably misled the court. This final hearing was much like an *ex parte* proceeding in that the adversarial parties were not present, and Judge Brown was left to depend on Respondent's representations alone. Respondent took advantage of this opportunity, successfully leading the court to issue an order that it would later vacate.

In addition, Respondent's misconduct in the Sparks and Jones matters, including lack of due diligence, failure to keep

his clients informed, failure to take steps to protect a client's interests, and incompetence, justifies the sanctions imposed by this Court.

## CONCLUSION

Given the gravity of Respondent's numerous incidents of misconduct, we hereby suspend Respondent for 90 days, order him to pay proceeding costs, and require that he be re-examined by this Court's Committee on Character and Fitness before re-activating his license to practice law.

TOAL, C.J., WALLER, BURNETT, PLEICONES, JJ., and Acting Justice G. THOMAS COOPER, JR., concur.