## 16913

ROYAL CROWN BOTTLING COMPANY, INC., *ET AL.*
v. WILLIAM E. CHANDLER, JR., *ET AL.*
(83 S. E. (2d) 745)

*Messrs. E. P. Riley,* of Greenville, and *Henry Hammer,* of Columbia, *for Appellants*

*Messrs. Price & Poag* and *Leatherwood, Walker, Todd & Mann,* of Greenville, *for Respondents,*

*Messrs. E. P. Riley,* of Greenville, and *Henry Hammer,* of Columbia, *for Appellants,*

September 27, 1954.

STUKES, Justice.

This appeal relates to six actions, five of which were commenced in the Court of Common Pleas of Greenville County and one in Richland County. They were consolidated and tried in Greenville. The actions are for an accounting of attorneys to clients and are, therefore, in equity. The factual findings and legal conclusions of the special referee, the Honorable Calhoun A. Mays, of Greenwood, were affirmed by the court which heard the case on exceptions to the referee's report. Therefore the concurrent findings of fact are not subject to reversal by this court on appeal unless they are without evidence to support them or are against the clear preponderance of the evidence. 3 S. C. Dig. 557 *et seq.*, Appeal and Error, key 1022.

The General Assembly of 1951, by provision of Section 95 (b) of the General Appropriation Act, 47 Stat. 546, 656, amended the State soft drinks tax by excepting therefrom "fruit juices plain and/or fortified." This came to the attention of the Executive Secretary and General Counsel of the State association of bottlers, William E. Chandler, Jr., one of the appellants. He conferred with W. B. Morrow, of Sumter, who was then president of the association of which he called a meeting in Columbia on June 15, 1951, where the effect of the amendment was discussed. Immediately prior thereto Chandler, who was already paid a substantial monthly salary, expense account and travel allowance by the association, interviewed some of the bottlers with a view to obtaining the employment of his law firm to procure, by litigation if necessary, refunds of the taxes on certain bottled drinks, which the Tax Commission was insisting upon collecting despite the above statute, in accord with a proposed contract prepared by him which provided for a contingent fee of twenty per cent. However, Chandler now

makes no claim to additional compensation for legal services to the bottlers in connection with the subsequent refunds, except as he may participate in the fee which may be recovered by Edens, who is the principal appellant; and this action is not concerned with the division. Both of these gentlemen are prominent members of the bar of this court.

There is sharp conflict in the evidence upon the contention of appellants that the result of the Columbia meeting was to authorize Morrow as the agent of the affected bottlers to engage counsel to prosecute their claims. The finding of the lower court was against the contention of appellants and, upon careful review of the evidence, we cannot say that the conclusion is contrary to the clear preponderance of it. However, the court came to the following conclusion, from which there is no appeal: "The bottlers by making no protest against having suits brought in their names; by accepting the fruits of the victory in the County Court of Richland County; and by bringing their present suits for funds represented by the compromise settlement, have clearly ratified those acts." An added finding, coupled with the foregoing, which is the main target of the appeal, is the following: "I find no evidence, however, to support a finding that they ratified Mr. Morrow's unauthorized agreement to pay a fifty (50%) per cent attorneys' fee."

After the June 15 meeting Morrow and Chandler conferred and concluded that a more experienced attorney than Chandler should be engaged to bring suits for the recovery of the taxes which the bottlers were instructed at the meeting to pay monthly under protest. They agreed upon the choice of Mr. Edens, if he were available, and Mr. Chandler interviewed him, after which Morrow confirmed the employment in a telephone conversation. The testimony of both Morrow and Edens is clear that no fee was fixed, only that it must be contingent upon recovery and that the plaintiffs would not advance costs and disbursements. The testimony of both thereabout is significant and is quoted in

part as follows: By Mr. Edens on direct examination: "He (Morrow) asked me what my idea of a contingent fee would be and I advised him that with so many uncertain elements and factors at that time it would be completely impossible for me to suggest a contingent percentage but as we moved along and the litigation crystalized I would be in better position, to agree on that." This supported Mr. Edens' pleadings in the actions; in the complaint in that which he instituted against the bottlers the fourth paragraph is:

"4. That when plaintiff was engaged to perform the legal services as aforesaid, no agreement as to fees was entered into for the reason that the factors upon which the fee for such services was to be based, as for example, the amount of money involved, the amount of work to be performed, the novelty of the question, the issues involved, the probable costs and disbursements, etc., were not readily ascertainable and therefore the agreement as to the amount of fee to be paid for such services was deferred until such date as these factors could be determined."

Pertinent testimony of Mr. Morrow follows:

."Q. When you discussed that with Mr. Edens, was there any conversation with reference to the terms under which he was employed? A. Well, he (Edens) asked something about that. I simply told him I was not in position to make any commitments as to set fees, any arrangements as to fee would have to be on a contingent basis.

\* \* \*

"You had no authority about a flat fee. What do you mean by that? A. By any set definite amount either percentage-wise or otherwise.

"Q. No agreement at that time as to fee? A. No, sir. \* \* \*

"Q. Did Mr. Edens make any statement to you with reference to the fee? A. He said he would go ahead, glad to represent the bottlers and do the best he could. That was something that would have to be settled and we just left it."

Time was short as it was then nearing the end of July within which a separate suit must be brought for each bottler who had paid under protest, and there were about 40 of them who are respondents here. Similar suits were brought each month for six months, which made a total of approximately 240 actions in all, which were brought in the Richland County Court in behalf of the present respondents.

A few days before the employment of Mr. Edens by Mr. Morrow the latter circularized the affected bottlers, asking for information necessary for the suits which the bottlers were instructed to send in an enclosed, stamped envelope addressed to Mr. Chandler. Blanks were included in the communication whereby the bottlers would agree, by filling and signing, to the payment of attorneys' fees and court costs in the amount of twenty per cent of the recovery. Few responded; certainly there was no general agreement to the suggested twenty per cent contingent fee and Mr. Edens had to proceed without direct authority from most of the respondents—only that extended in their behalf by Morrow—and had to obtain the factual information for the suits from the records of the Tax Commission.

A test case was tried, or test cases were tried, in the Richland County Court on January 22nd, of which notice was given to the bottlers and their attendance invited by Mr. Chandler by circular letter dated January 17, 1952. On January 29 a telegram was sent to the litigant bottlers signed by Mr. Chandler, Mr. Edens "and associates," which advised of favorable decision of the suit or suits which were tried.

On January 31 another circular letter, signed as that above and addressed to "Bottlers represented in tax cases," advised of an amendment to the appropriation bill which was then before the General Assembly which threatened the recovery. The testimony of Mr. Edens reveals that the Governor became alarmed at the situation and the possible effect of the litigation upon State revenues and requested

the legislation just mentioned, and Mr. Edens interviewed the Governor at length and also the chairman of the Senate Finance Committee, the result of which was an agreement that the proposed legislation should be withdrawn, the appeal of the State from the court decision or decisions abandoned, and refunds of the taxes made through December, 1951. The record is not clear and we have not searched the statutes, but apparently the cited 1951 exemption of fruit juices from the soft drinks tax law was repealed as of February 1, 1952.

Mr. Edens called Mr. Morrow over the telephone during these negotiations and told him that the situation was precarious and the cases should be settled upon the above conditions, for which he required a fee of fifty per cent of the amount of the recoveries and refunds. Some of the pertinent testimony of Mr. Morrow follows:

"The Witness: I was informed by Mr. Edens that the amount of taxes that might be recovered had been reduced from the original estimate of more than half a million dollars down to possibly as much as two hundred thousand dollars.

"Q. Was the original estimate correct? A. According to the first information we had in the beginning. Mr. Edens stated plainly to me that a decision has got to be reached about this fee, he said under the circumstances I feel the best interests of the bottlers is to get this settled as quickly and early as possible and the fee has got to be fifty per cent.

"Q. Did you agree to that fee? A. I talked with him a little in the beginning, pretty fierce at first, and I said now you know you ought to be able to do better than that. He said, you got no conception of the amount of work, expense and effort that I, personally, put into this to say nothing of the attorneys I have associated with me.

"Q. Did you offer an alternative amount? A. I tried to get him down to forty, I finally said if that's it, that's it. I was also one of the bottlers who had a claim and they were in the same boat I was in on that. I hated to see my

money go like that, but I wanted to get all I could out of it and I know they did, but I was convinced from the information Mr. Edens passed on to me that the best interest, in my judgment, of all of us would be served to get a settlement."

The following is from the testimony of Mr. Edens:

"I told him (Morrow) that if it was terminated then we would have to agree on a fee. I didn't see how, with all the work that had been done and the expenses incurred I could handle it on any other basis other than fifty per cent. Mr. Morrow agreed that the situation was a critical one and that he thought that my recommendation was a good one with reference to terminating the litigation in such fashion. He asked me if I could not agree on a fee of forty per cent. I told him that under all the facts and surrounding circumstances, the work that had been done by all the attorneys and expenses already incurred which if the litigation had been lost nobody would pay it but me, I thought that a fifty per cent. fee was completely fair and proper and he told me to go ahead then and terminate the matter on that basis. He definitely agreed to the fifty per cent. fee and told me to go ahead and do the best I could and get all the money I could and still maintain the goodwill of the Legislature. I went ahead and did that. I advised Senator Brown that we would terminate the litigation. He stated he would recommend to the tax commission it be paid up to January first. I tried to get him to recommend to February first, but he was right grim and held my feet to the fire about January first, although the exemption statute was terminated as of February first."

Unfortunately, but as is common in such cases, there were important misunderstandings between the participants in this telephone conversation in which the fifty per cent. fee was purportedly agreed upon. Mr. Morrow understood that the settlement contemplated refunds of taxes through the month of January 1952 and would be made immediately, whereas they ended December 31, 1951, and settlement was

not tendered until August. He further understood that the attorneys would undertake to persuade the General Assembly to reduce the tax thereafter to one-half of the former levy. This is shown by verified copy of letter in evidence (plaintiff's exhibit 31) from Morrow to Messrs. Chandler and Edens, dated Feb. 11, 1952, in which he reported the agreement of some of the bottlers, and refusal of others, to, quoting, "the adjustment of attorneys' fee in the amount of 50% of the payments recovered for the period July 1, 1951 to February 1, 1952." The second paragraph of this letter follows:

"The agreements to a settlement of 50% for attorneys' fee was made, I am sure, on the basis of your general letter to the concerned bottlers under date of January 31st, 1952, and my personal recommendation to these bottlers that we accept your assurance of tax refunds for the seven months period ending on February 1st this year, and in consideration of other conditions outlined to me and conveyed to them."

Appellants objected to the admission of the copy of this letter but it was quite relevant and its genuineness was adequately proven. The exception thereabout, which was not seriously argued in appellants' brief, is overruled.

Mr. Edens testified that he did not receive the foregoing letter but that he remembered Morrow telling him that he (Morrow) misunderstood about the period covered by the agreement of compromise settlement and understood that it included January, which it did not.

Mr. Morrow testified in the trial of these cases, in part, as follows, relating to his "understanding" with Mr. Edens:

"Q. What did you tell them (the bottlers) about that? A. I told them my understanding was we would get refunds from July 1, 1951 to February 1, 1952.

"Q. You told them you understood that instead of going to the first of the year they were to get all of January? A. That is my statement.

"Q. What did you tell them about a possible reduction of the tax on the crowns? A. I told them that our attorneys had committed themselves to work religiously.

"Q. I didn't ask you that, I asked you what did you tell them about the reduction of the tax on the crown, not a thing about the work of the attorneys. He can answer.

"The Referee: Restrict your answer to the crown, Mr. Morrow.

"A. Our attorneys, Mr. Edens in particular, had told me that he would be willing to adapt himself to his very best efforts in our behalf at the forthcoming Legislature to make an effort to get that tax reduced. * * *

"Q. The January payments were certainly connected in there? A. That was my understanding.

"Q. They were going to get a proper (prompt?) settlement in February, right away? A. I was told they thought we could settle it right away.

"Q. You didn't get the reduction of the tax, did you. You didn't get January? A. No.

"Q. Or the settlement in February? A. It was left up in the air."

Effort was made by Mr. Edens with the Tax Commission and the Attorney General to secure refunds through January 31, 1952, but upon threat on the part of the State to prosecute appeal from the judgments in the test cases which had been tried, the effort was abandoned. Checks in part payment of the refunds were finally obtained from the State, which were payable to the bottlers entitled and to Mr. Edens as attorney and on August 26, 1952, he sent telegrams to all of the bottlers outside of Columbia to come there next day for settlement at a hotel where he had engaged rooms. He had his checks prepared to each bottler-beneficiary for fifty per cent of the latter's refund and proposed that the bottlers endorse the checks of the State and turn them over to him; but the respondents balked at payment of more than twenty per cent fees, which was the rate

of Chandler's original proposal. There was newspaper and other publicity and Mr. Edens was fearful of some possible legal action whereby payment of the State's checks would be enjoined, on which account he had induced the Tax Commission to issue the checks in the amount of seventy-five per cent of the apparent amounts which should be refunded under the settlement. The Commission had to check inventories of the various bottlers in order to determine the exact amounts of the refunds. In that impasse between the attorney and the clients, Mr. Edens had his checks redrawn whereby he paid to the most of the bottlers eighty per cent of the seventy-five per cent recovery, stated to each who accepted the checks that he would look to the balance of approximately twenty-five per cent of the refunds for full payment of his claimed fifty per cent fee. Some of the bottlers refused the checks when they were given that information. The balances have since been paid by the Tax Commission and, by consent, the unused checks were endorsed and delivered to the referee. They aggregated $117,132.74 and have been deposited in bank by him, subject to the order of the court.

The conclusion of the referee, confirmed by the court, was that all of the claimant bottlers had a contract, express or implied, originated by Chandler, for the handling of their claim and suits for a fee of twenty per cent, contingent upon recovery; and his recommendations were, and the judgment under appeal therefore is, that an accounting be had between Mr. Edens and the respective bottlers so that judgment may be entered for payment of twenty per cent of the recoveries as attorneys' fees, and eighty per cent to the bottlers, who are parties to the actions, as their interests may respectively appear; and that the costs of the actions be assessed in the same proportion and paid from the fund in his (the referee's) hands. The decree of the court added a provision for the payment of a reasonable fee to the special referee, to be subsequently determined by the court in the absence of agreement by the parties.

The gravamen of the appeal is that the unappealed finding of the referee, confirmed by the court, that the bottlers ratified the employment of Mr. Edens requires the further finding that they are bound by Morrow's agreement to a contingent fee of fifty per cent; and they rely upon *Southern Bell Telephone and Telegraph Co. v. W. R. N. O., Inc.,* 216 S. C. 533, 59 S. E. (2d) 146, for the proposition that there cannot be a partial ratification. The decision under appeal is that (1) the employment of Mr. Edens and (2) Morrow's subsequent agreement as to his fee were separate and distinct transactions, and the latter was not ratified by the bottlers. This may be sound, which we do not decide but prefer to rest our similar result upon the more obvious ground that there was, in fact, no agreement between Morrow and Edens upon the terms of the compensation of the latter.

Morrow's understanding, which he passed on to the other bottlers, was that for 50% of the recoveries the refunds would extend through January; immediate settlement would be made; and Edens would at least try to obtain reduction by the legislature of the soft drinks tax. Any other conclusion thereabout would be against the clear preponderance of the evidence which has been quoted and other contained in the long trial record, all of which has received our painstaking consideration. There was simply no meeting of the minds of Edens and Morrow in their negotiations over the telephone, and therefore no contract for ratification by Morrow's principals who are the bottlers-respondents.

Although it is unnecessary for the purpose of this decision, there is an important consideration which ought not to be overlooked or omitted. Attorneys occupy a trust relationship to their clients and agreements between them, as between trustees and *cestuis,* are examined with utmost care by the courts in order to avoid any improper advantage to the attorney. 4 S. C. Dig., Attorney and Client, key 123 *et seq.,* p. 407 *et seq.* It was said in *Wise v. Hardin,* 5 S. C. 325, at pages 328, 329: "In all matters,

either of contract or gift, between attorney and client, from the confidential relation which must necessarily exist between them, the law requires not only proof of fairness on the part of the former, but the influence which their relative position allows him to exercise demands that severe and rigorous fairness which can leave nothing of doubt or uncertainty behind. While it is not the exact relation which exists between trustee and *cestui que trust,* where the contract between them can be avoided at the mere will of the latter, a very refined equity has exacted that the rules and requirements which apply to this fiduciary connection shall, to a great extent, regulate and control all contracts and gifts between attorney and client." Enough of the evidence in the case in hand has been stated to show, as expressly found by the lower court, that Morrow was not dealing on equal terms with his counsel when the figure of fifty per cent was agreed upon by them over the telephone. If, therefore, there had been a full and otherwise enforceable fee agreement between them (which the evidence clearly establishes there was not), the delicate question would remain as to whether the court would enforce it. We do not reach that question, but see the subject North Carolina decision and the appended annotation in 19 A. L. R. 844, 847. Appellants' exception to the conclusions of the trial court hereabout, which were adverse to them, was not argued in their brief on appeal.

The result of the foregoing is that appellants' first question is resolved against them. Their second question is, in our view, immaterial; and the third is sustained. The latter challenges the conclusion of the trial court that the bottlers had a contract with Chandler for a contingent fee of twenty per cent of their respective recoveries. It is against the clear preponderance of the evidence and cannot stand. Appellants' exceptions thereabout are therefore sustained. Moreover, if Chandler had a prior contingent fee agreement with some of the bottler-respondents it was superseded by the subsequent employment of Edens at a fee to be later agreed upon.

Having sustained the appeal with respect to the alleged contract between Chandler and respondents, which we find, in accord with appellants' contention, did not exist, reversal of the judgment follows. This, we think, accords with the clear preponderance of the evidence. And we think it is equally clear on the record that Mr. Edens is entitled to fair and reasonable compensation for his professional services, the amount of which should be fixed by the court upon application by him. He anticipated this in his forthright testimony, Tr. f. 1398, as follows:

"Q. My question was as to the fee of fifty per cent., if he wasn't relying entirely upon the statements of Mr. Morrow and Mr. Chandler. Is there any other source he has been depending upon to fix the fifty per cent. except the statements of Mr. Morrow and Mr. Chandler?

"Referee: Any other source which fixed the fee?

"Witness: Certainly that was the source of my representation in this litigation but if it should develop that the court should conclude that Morrow did not have such agency and the court should conclude that what they talked about as a contract wasn't a contract before I was retained and acted as attorney in good faith, I think it is right and proper that this court should award the fee."

The judgment is reversed and the case is remanded to the trial court for the fixing of a reasonable fee which will be awarded to Mr. Edens. Such relevant evidence upon the issue as may be offered by the parties should be received by the court which may, in its discretion, refer the issue to the Master or a special referee. There must also be an accounting, as recommended in the former report of the referee.

The powers of the court with respect to the fees of attorneys (who are officers of the court) are definitized in the order on petition for rehearing in *Bank of Enoree v. Yarborough*, 120 S. C. 385, 391, 113 S. E. 313, 315. It would be improper for this court, at this stage, to express or imply any opinion as to what the fee in this case should be, from which we therefore refrain.

Reversed and remanded.

TAYLOR, OXNER and LEGGE, JJ., and J. FRANK EATMON, Acting Associate Justice, concur.