17935

In the Matter of I. H. JACOBSON, Respondent

(126 S. E. (2d) 346)

*Messrs. Daniel R. McLeod, Attorney General,* and *William L. Pope, Assistant Attorney General,* of Columbia, *for Complainants,*

*Messrs. William H. Grimball, Jr.,* and *Malcolm L. Mc-Crae,* of Charleston, *for Respondent,*

June 19, 1962.

PER CURIAM.

After hearings pursuant to our Rule on Disciplinary Procedure, the Board of Commissioners on Grievances and Discipline filed with this court its final certified report finding the respondent guilty of professional misconduct and recommending that he be permanently disbarred. The matter is before us on that report and the respondent's return to our order requiring him to show cause why the report of the Board should not be confirmed and a disciplinary order be issued in accordance with said recommendation.

Respondent is a member of the Bar of South Carolina, engaged in the practice of law in Charleston. Complainants

are the members of the Grievance Committee of the Charleston County Bar Association and instituted this proceeding through the service of its complaint upon the respondent on May 7, 1959. The complaint having been answered by the respondent, a Panel was appointed pursuant to Section 9 of the Rule and, after due notice, hearings were held before it during the period August 12, 1959 through August 21, 1959. The Panel filed its report, including its findings of facts and recommendations, on May 16, 1961. This report was reviewed by the Board of Commissioners on Grievances and Discipline and a hearing held before it after which it adopted the report and recommendations of the Panel as the findings and recommendations of the Board.

The complaint herein alleges fifteen separate cases against the respondent, charging that in connection with certain loans: (1) respondent conspired to defraud uneducated persons of money and property by a deceitful scheme; (2) respondent added grossly excessive, over-reaching and improper fees and costs and usurious charges; (3) respondent deceitfully took advantage of and over-reached ignorant and uneducated people to their detriment and for respondent's own financial gain, in flagrant and wilful disregard of respondent's duties as a practicing attorney and member of the Bar of the Supreme Court of South Carolina, to deal fairly, honestly, candidly and truthfully with a layman; and (4) that such unethical, unlawful and improper practices on the part of respondent constituted professional misconduct and tended to pollute the administration of justice and to bring the courts and legal profession into disrepute. In addition to the above allegations, the respondent was charged with forgery and unlawful advertising, which charges were abandoned by the complainants and not acted upon by either the Panel or Board. Additionally, the Panel recommended that the respondent be exonerated of the charge of conspiracy to defraud alleged in the complaint.

The respondent's verified answer denied wrongdoing on his part, averred that he acted solely, separately and in-

dividually as an officer and agent of Jacobson Mortgage Company in negotiating the mortgage loans in question, and asked that the verified complaint be dismissed and that he be exonerated of the charges therein contained.

The transcript of testimony and the exhibits in this case are voluminous, but the transactions involved are quite similar. It is our opinion that the facts hereinafter recited have been convincingly established by the testimony and evidence.

The respondent is approximately forty-eight years of age. He graduated from the University of North Carolina Law School in 1937 and was admitted by examination to the practice of law in North Carolina during the same year. After a brief period of practice in North Carolina, he married a South Carolinian and moved to Charleston, being admitted by examination to the practice of law in South Carolina in 1941. From such time to the present, with the exception of a period of active duty as an officer in the United States Navy, the respondent has practiced law in Charleston, either alone or with various associates and partners. Almost from the beginning of his practice in Charleston, the respondent has engaged in making loans for individuals. During the latter part of 1955, respondent was contacted by at least four small building contractors operating in the Charleston area and agreed with them to finance home improvement loans generally involving improvements on property situated in rural areas of Charleston County.

From the latter part of 1955 until November 9, 1957, the respondent operated individually under the name of Jacobson Mortgage Company, which was not a corporation but a business or trade name used by the respondent until Jacobson Mortgage Company was incorporated on November 9, 1957 with respondent and his wife as its only directors and officers, and with respondent as its principal stockholder. This mortgage company ceased doing business in 1958, and its op-

erations were taken over by the Ideal Investment and Loan Company, which was chartered June 30, 1958, its only officers and stockholders being I. H. Jacobson and one Jack White and its principal stockholder being I. H. Jacobson. The law offices of the respondent at 19 Broad Street, Charleston, served as the offices of both Jacobson Mortgage Company and Ideal Investment and Loan Company. From the latter part of 1955 to the time of the hearing before the Panel, the respondent had made more than four hundred loans of the nature hereinafter described. Most of the borrowers were illiterate or nearly so, and had very low incomes, in many cases scarcely sufficient for subsistence.

Respondent had several clients for whom he was engaged in making loans. At times he would discuss the making of a specific loan with the client in advance of making it, and at other times he would make the loans to himself or to Jacobson Mortgage Company and then assign the notes and mortgages to clients whom he on occasion contacted only after the loans had been made. He had a general arrangement with one Max Levine to make loans for him, it being agreed that the interest on said loans would be the maximum legal 7 per cent per annum and, in addition thereto, Levine would be entitled to a 10 per cent discount on the amounts loaned. Other clients involved in the cases here in issue made loans through the respondent upon discounts ranging from 5 per cent to 10 per cent. Respondent guaranteed to his clients payment of all amounts due on the papers taken for, or assigned to, them. In a few of the cases here in issue, no discounts were listed on the closing statements.

In the typical or usual case, the transactions in question came about as hereinafter described. The contractor would establish contact with a party who desired home improvements and enter into a contract with him for such improvements to be completed for a specified price. The contractor would then bring the signed contract to the respondent for the purpose of handling the loan. He would, if possible, give

respondent a description of the real estate. The respondent testified he would then have an appraisal made, either by himself, members of his office, or outsiders, although there was no evidence of any outsider being involved as an appraiser in any of the cases at issue except one. Respondent would then determine the fire and life insurance needed for a three year period, closing costs, attorney fees, appraisal fees, loan discount charged to the borrowers, reserve fund discount charged to the contractor and the other items of closing costs. The respondent stated that he would then give the total amount of these closing costs and all other charges to the contractor, who had the responsibility of passing this information on to the prospective borrowers. The closing costs, discount, fees and insurance often aggregated 35 per cent to 40 per cent, or even more, of the amount of the contract. After the work was completed, the contractor was obligated to bring the borrower to respondent's office for the loan closing. During the interim, title examination would be made by an attorney in respondent's office, who would give a description of the real estate to the office secretary for the purpose of preparing the mortgage. The loan would then be closed in the office of respondent, and the contractor paid.

Respondent testified that all loan papers and the itemization of the closing costs were explained to the borrowers before they signed the loan papers. Numerous borrowers, however, testified that such were not explained or even gone over with them. It is apparent in these cases that the respondent either failed to go over these matters with the borrowers or else did so in such a brief and inadequate manner that they were not likely to understand the full import of such.

After the closing of the loan, each borrower would be sent a letter on respondent's professional stationery (showing respondent's name, the fact that he was an attorney, and the address of his office) welcoming him as a "client" and advising him of the payment schedule to be followed, and there

would usually be enclosed a green receipt book which showed the amount of the monthly payments and, on occasion, the total amount of the loan. Each such receipt book had words in bold lettering on its face as follows: "Law Offices/ I. H. Jacobson/ Attorney and Counsellor/ 19 Broad Street/ Charleston, S. C./ Office 3-5339/ Residence 3-5401." No break down of the items of the closing costs were sent or given to any borrower until respondent was subsequently contacted by outside counsel of such borrower or by some informed person who came to the assistance of such borrower. Fire insurance certificates were frequently sent out to the borrowers, and in some cases certificates showing the existence of a policy of credit life insurance would be mailed to the borrower.

The issuing of the described receipt books by respondent to borrowers, the use of his professional offices for the conduct of the loan business in all of its aspects, and numerous other facts appearing in the record indelibly intertwine respondent's loan business with a substantial segment of his law practice. It is difficult in the loan transactions complained of to separate respondent, the attorney, from respondent, the lender or agent of the lender. It is to be further noted that many of the loan transactions in question were consummated before the incorporation of Jacobson Mortgage Company. The contention of respondent that he acted solely as an agent for the said mortgage company in these transactions and that he is thereby not subject to professional discipline is untenable.

From the inadequacy of the title notes offered in evidence and the title defects later found to be present in many of the properties mortgaged, it may be concluded that in these loans the title was not, in the proper legal sense, examined. No title opinion letter was rendered to anyone.

Beginning about the middle of the year 1956, after respondent had received many complaints from borrowers about the unworkmanlike construction performed for them,

respondent began paying the contractors from the loan proceeds only 90 per cent of the contract price, reserving 10 per cent thereof from each contractor as an escrow fund reserve. The escrow fund agreement with each contractor was general and oral. The primary purpose of such agreement with each contractor was to enable the respondent to charge against the escrow fund for each contractor any adjustments which were necessary to be made due to unsatisfactory construction by the contractor. These reserve escrow funds for the contractors, the general funds of respondent's law office, the escrow funds for the benefit of the borrowers consisting of advance fire and life insurance premiums retained by respondent from the proceeds of the loans, the attorney's fees, brokerage fees and other charges made in connection with the loans, were all commingled in one bank account in the name of I. H. Jacobson in the Citizens and Southern Bank of Charleston. Both respondent's wife and the respondent were authorized to withdraw funds from this bank account. Also respondent's books did not reflect any separate escrow account for any of the above-mentioned funds. There was no separate account at the bank or on the books even for the fire and life insurance premiums which were collected three years in advance from the borrowers. Respondent paid fire insurance premiums only yearly and life insurance premiums only monthly. The bank account on occasion showed a credit balance of less than three hundred dollars. Thus, escrow funds were not held separate and readily available for application to the purposes for which they were collected.

The total principal amount of the indebtedness shown on the face of the mortgages in question was arrived at by adding to the price of the construction contract, any monies advanced to the borrowers for paying off prior encumbrances, and closing costs including brokerage and discount fees. Respondent testified that the appraisal fees were usually computed at $35.00 and that the brokerage, discount, and recording costs combined would be estimated so as to make the total of the loan result in a round figure in order

to facilitate the handling of same. The appraisals of the property were made before the construction was begun and were made in practically every case, if not every case, either by the respondent or some person from his law office. The inspection and appraisal appeared to be of the most cursory type, and its purpose apparently was merely to establish that the real property offered as security was in existence. Despite many complaints about the construction work, respondent continued making loans and did not make reinspections of the property after the construction work was completed. He states that he asked the borrowers at the time of the closing of the loan if they were satisfied and, if they so stated, he disbursed the funds to the contractors.

Each of the fifteen loans constituting the subject matter of the complaint was handled by the respondent either in his individual name, the name of Jacobson Mortgage Company, or in the name of some third party appearing on the face of the mortgage as the original mortgagee. In each of these cases, the difference between the amount of the construction contract and the principal indebtedness shown on the mortgage is shocking. This difference is made up of numerous items of closing costs charged to the borrower, some of which are completely indefensible. While it is impractical to include in this opinion the details of all cases with which this proceeding is concerned, the following is the first case alleged in the complaint and is essentially typical of the other cases.

This case concerns a loan to Ralph and Emma Frazier. Ralph was a 54 year old illiterate Negro resident of John's Island in Charleston County who worked as a farm laborer for wages approximating twenty dollars per week. The construction contract, dated November 1, 1956, was for $2,690-.00 covering construction of a three room home. This house was viewed by the Hearing Panel, and is described in its report as being about 12 feet wide and 30 feet long, sagging, and of incredibly poor construction. It is a single story

dwelling with composition, rolled roofing, and contained no doors between the rooms and no plumbing. A witness experienced in the building trade testified that in his opinion the materials in the house were worth approximately $850.00 and labor costs for constructing the same would approximate $250.00. The note and mortgage for $3,600.00 was dated November 16, 1956, payable in monthly installments of $60.00 each, with a provision that the entire amount of the outstanding indebtedness remaining after crediting the stated monthly payments would be due and payable at the end of three years. The closing statement is as follows:

| | |
|---|---:|
| Fire Insurance (3 years) | $ 132.84 |
| Life Insurance (3 years) | 324.00 |
| Attorney's Fees | 100.00 |
| Discount Charges | 252.00 |
| Brokerage | 36.00 |
| Appraisal, RMC, Stamps | 65.16 |
| Contractor | 2,690.00 |
| | $3,600.00 |

Shortly after the closing of this loan, Ralph received the aforementioned green account book, giving the address of respondent's office as the place to make the monthly payments. As in all of these cases, the loan carried interest at the rate of 7 per cent per annum.

Ralph paid, over a period of many months only $50.00 on this mortgage after which respondent brought foreclosure proceedings and, through the intervention of the Legal Aid Society, a Charleston attorney represented the borrower. After lengthy negotiations, the note and mortgage were cancelled and new ones substituted in the amount of $1,500.00.

It is significant and typical that no detailed statement of the costs in this loan transaction was given by respondent until the Legal Aid Society made demand for it. It is further typical that whenever an attorney was retained in a

case to represent a borrower, either through the Legal Aid Society or the personal initiative of the borrower, the mortgage would be renegotiated through the respondent in an amount substantially and often drastically less than that appearing in the original instrument

The closing statement reveals that although sufficient funds were charged the borrower to pay fire insurance premiums for a three year period, respondent purchased only a one year policy. The testimony shows that had respondent purchased a three year insurance policy in advance, the basis on which the money was collected from the borrower, rather than purchasing three separate annual policies, a substantial reduction in premiums could have been achieved. If the life insurance policy was in force for three years, the premium on this $3,600.00 loan, not taking into consideration the declining amount of the indebtedness, would be $32.40 per year or $97.20 for the three years based on the conceded cost of this insurance which was 75¢ per $1,000.00 on the unpaid balance per month. The charge made by respondent for life insurance for three years to this borrower was $324.00. It is to be noted further that some of the loan transactions in question were consummated prior to the effective date of respondent's contract with the life insurance carrier, despite which fact, the life insurance item was charged against the borrower even though no policy was in effect.

With reference to the item designated "Appraisal, RMC, Stamps", the record discloses that $61.97 of this charge was for the appraisal alone, which was retained in the office of the respondent. The nature of the appraisals made by respondent has previously been commented upon.

It is evident from an examination of these cases that the respondent made charges that were either shockingly excessive or completely unjustified. It must be concluded, taking into consideration all circumstances surrounding these cases, that the respondent was cognizant of the improper nature of these charges, and the explanations advanced by him in at-

tempted justification are deemed insufficient. Indeed, the following testimony of the respondent on cross examination concedes the excessive nature of the charges:

"Q. All right, sir—isn't it a fact, Mr. Jacobson, that the reason you did not want to go into any litigation was because these charges were so grossly excessive that you did not want to reveal it?

"A. They were excessive.

"Q. There's no question about it?

"A. No, sir.

"Q. And you charged them to the borrower?

"A. Yes, sir.

"Q. And they were to pay it?

"A. Yes, sir."

The respondent has excepted to the finding of the Board that the loans involved were usurious. We do not deem a determination of this question essential to this opinion. The function of this court in disciplinary proceedings has been clearly stated in the recent case of *Burns et al. v. Clayton et al.,* 237 S. C. 316, 117 S. E. (2d) 300, at pages 307 and 309:

"The fallacy underlying these contentions is that they overlook the following fundamentals: that this is not a criminal proceeding nor an appeal from the judgment of a lower court; that the Board of Commissioners on Grievances and Discipline are officers of this court, commissioned and charged with the duty of investigating alleged misconduct on the part of their fellow members of the bar of this State and of reporting to this court the proceedings of their inquiry, and their findings and recommendations; that the Board's report is advisory only, this court being in nowise bound to accept its findings of fact or to concur in its recommendations; and upon this court alone rests the duty and the grave responsibility of adjudging, from the record, whether or not professional misconduct has been shown, and of taking appropriate disciplinary action thereabout.

\* \* \*

"But commission of a crime by a member of the bar is not prerequisite to the power of this court to disbar or suspend. The right to practice law is not an absolute one; as an officer of the court, the lawyer's tenure is during good behavior; and the court that admitted him to practice has inherent power to remove him from office when by clear and convincing proof it has been shown that his conduct has been such as to evidence moral turpitude or tend to bring the courts and the legal profession into disrepute."

An examination of the entire record herein convinces us beyond doubt that the respondent has engaged in grave professional misconduct. The respondent was the *sine qua non* of a large scale loan operation whereby less fortunate citizens were over-reached. There were more than four hundred loan transactions and, although only fifteen are alleged as grievances in the complaint, it is to be noted that the respondent testified that the same type of charges made in these fifteen cases were made in other transactions. The continuance of the respondent in this activity after notice had been given him of the grossly deficient construction being foisted upon the borrowers and complaints had been made to him of excessive "closing costs" by fellow attorneys representing aggrieved borrowers, unerringly points to the conclusion that avarice rather than moral responsibility had become the guide to his professional conduct. It should be here reiterated by this court that the practice of law is a profession—not a business or skilled trade. While the elements of gain and service are present in both, the difference between a business and a profession is essentially that while the chief end of a trade or business is personal gain, the chief end of a profession is public service. It is the obligation of lawyers to preserve the heritage which is theirs as members of a time-honored profession, and to justify the confidence which the public reposes in them. It is the duty of the lawyer to make certain that commercialism is not allowed to debase the relationship of attorney and client.

The uneducated status of respondent's clientele required a greater effort on his part to make certain that they fully comprehended the transaction in question than would have been required with more learned clients. The record reveals that this effort was not expended by the respondent. The relationship of attorney and client existed both as between the respondent and the lenders and respondent and the borrowers in these loan transactions. The exacting standard imposed upon an attorney in transactions with his clients is stated in the case of *Royal Crown Bottling Company v. Chandler,* 226 S. C. 94, 83 S. E. (2d) 745, at page 750:

"Although it is unnecessary for the purpose of this decision, there is an important consideration which ought not to be overlooked or omitted. Attorneys occupy a trust relationship to their clients and agreements between them, as between trustees and *cestuis,* are examined with utmost care by the courts in order to avoid any improper advantage to the attorney. 4 S. C. Dig., Attorney and Client—123 *et seq.,* at page 407 *et seq.* It was said in *Wise v. Hardin,* 5 S. C. 325, at pages 328, 329: 'In all matters, either of contract or gift, between attorney and client, from the confidential relation which must necessarily exist between them, the law requires not only proof of fairness on the part of the former, but the influence which their relative position allows him to exercise demands that severe and rigorous fairness which can leave nothing of doubt or uncertainty behind.' "

The respondent has demonstrated, by a continued course of conduct, an attitude wholly inconsistent with a recognition of proper professional standards. The Canons of Professional Ethics of the American Bar Association were adopted as Rule 33 of this court in 1956, and represent the consensus of the Bar on the moral standard that lawyers in their practice should follow and uphold. In our judgment the conduct of the respondent as disclosed by the record clearly and convincingly shows a violation of the following Canons: Canon 6 (Adverse Influences and Conflicting In-

terests) ; Canon 11 (Dealing with Trust Property) ; Canon 29 (Upholding the Honor of the Profession) ; and Canon 32 (The Lawyer's Duty in its Last Analysis). The disciplinary action against this respondent having been instituted prior to that in the case of *Burns et al. v. Clayton et al., supra,* we feel that the reasons prompting leniency in that case are equally applicable here so as to justify our not invoking the extreme penalty of disbarment.

The respondent, I. H. Jacobson, is indefinitely suspended from practice of law in this State. He shall forthwith surrender to the clerk of this court the certificate heretofore issued by this court admitting him to practice.

Let this order be published with the opinions of this court.

And it is so ordered.